[No. 17086-1-III.   Division Three.   January 13, 2000.]

THE STATE OF WASHINGTON, *Respondent,* v. JEFFREY Q. GRISWOLD, *Appellant.*

*Carl E. Hueber* of *Winston & Cashatt Lawyers, P.S.*, for appellant.

*James L. Nagle, Prosecuting Attorney*, and *Gabriel E. Acosta, Deputy*, for respondent.

BROWN, J. — A jury found Jeffrey Griswold guilty of third degree child molestation. He contends the trial court erred when it: (1) admitted testimony regarding prior bad acts as showing a common scheme or plan; (2) excluded evidence of his reputation for sexual morality; and (3) found that certain impeachment evidence was inadmissible as collateral. The unique use of a truth or dare game combined with other similarities support the trial court's decision to admit the prior bad act testimony. Although we conclude reputation for sexual morality is relevant, we decide a proper foundation was not established here. The proposed impeachment evidence is collateral and not admissible. We affirm.

## FACTS

Jeffrey Griswold taught Tae kwon do classes at a studio in Walla Walla. C.C. was a 14-year-old girl whom he began teaching in 1994. Tae kwon do is a martial arts activity also teaching deference and respect, especially for higher-ranking participants. On January 11, 1997 in the late afternoon, Mr. Griswold gave C.C. a ride home from the studio. Mr. Griswold said he had to stop by his house and invited her in.

C.C. later testified to the following events. Once inside, they sat on a couch and began talking in the dark. Mr. Griswold asked C.C. to play a game of "Truth or Dare." C.C. testified Mr. Griswold knew she was carrying condoms and pulled them from her pocket. One condom was opened by C.C. Then, C.C. dared Mr. Griswold to put a condom on a doorknob; he did. Mr. Griswold dared C.C. to put a condom on her finger; she refused and they playfully struggled. Mr. Griswold told C.C. to pick one of his hands and imagine his fingers were lips, then lay back on a couch with her eyes closed and her arms over her head. Mr. Gris-

wold touched her face, stomach and thigh over her clothing. Mr. Griswold suggested C.C. phone her mother to tell her that she was invited to dinner at Mr. Griswold's home. Mr. Griswold told her to say his wife was home. After the call, Mr. Griswold put C.C. over his shoulder and carried her back to the couch. The room was still dark.

C.C. testified that Mr. Griswold again asked her to pick a hand and lie back as before. This time C.C. said he fondled her vagina under her panties and touched her breasts under her bra. Afterwards, C.C. told Mr. Griswold that she had fallen asleep in response to his inquiry whether anything was wrong. Around this time another of Mr. Griswold's students came by; Mr. Griswold told C.C. to hide in the bathroom. When C.C. returned the student was still present. They left in two cars to get something to eat. Mr. Griswold took C.C. to McDonald's drive-through, then home. At some point as Mr. Griswold was driving C.C. home, Mr. Griswold asked, "are you going to tell anybody?" After C.C. said she would not, Mr. Griswold then said, "I could also get in a lot of trouble."

C.C. disclosed the events to a school counselor. In April 1997, Mr. Griswold was charged with third degree child molestation. Before trial, Mr. Griswold unsuccessfully moved to exclude the testimony of two witnesses. Both later testified about similar prior acts of sexual misconduct. The court gave appropriate limiting instructions before each witness testified and in the final jury instructions.

The first witness, R.I., Mr. Griswold's niece, testified that roughly 11 years earlier, when she was 11 years old, Mr. Griswold molested her. When she was alone with Mr. Griswold at his house, he forced her to lie on a couch with him and watch an x-rated video. Then, Mr. Griswold suggested they play truth or dare. He dared R.I. to go skinny-dipping but she refused. Mr. Griswold then tried to talk R.I. into giving him a back rub in the bedroom. When she refused, he took her by the wrist, forced her into a darkened bedroom, and made her get into bed with him. Then, Mr. Griswold made a game of taking clothing off by having R.I.

take a piece off with him doing the same until they were in their underwear. Next, he suggested they give each other back rubs. R.I. alleged Mr. Griswold then tried to persuade her to "get white stuff to come out of his penis like on the movie." Mr. Griswold touched her skin on her belly button and stomach area. Mr. Griswold had her promise not to tell anyone. He promised in return to give her karate lessons. R.I. disclosed the events about a month-and-a-half later. Mr. Griswold acknowledged the disclosure in his opening statement but suggested it was part of a dispute with his former wife and her family.

The second witness, M.G., a daughter of Mr. Griswold's friend, testified that 12 or 13 years earlier when she was 6 or 7 years old, Mr. Griswold had sexual contact with her. She stated at least once while in his car, Mr. Griswold unzipped his pants and forced her to touch his penis over her resistance. The remaining sexual contacts described occurred at Mr. Griswold's home. Mr. Griswold would take M.G. by the hand and ask her to play games. M.G. mentioned a "Truth or Dare" type game and "boyfriend/girlfriend" type game and explained how the games were played. Mr. Griswold would dare her to take off clothes or allow him to touch her upper thighs, midsection and chest and private parts over her clothes. At times, Mr. Griswold would dare her to touch his private parts. One time he may have lifted up her shirt. The game of boyfriend/girlfriend involved holding hands and kissing. Mr. Griswold would ask her not to tell and at times promised to buy her things at the store. He said, if she told, bad things would happen and nobody would believe her. M.G. said she disclosed these events prior to when the events with C.C. transpired.

When Mr. Griswold testified, he emphatically denied having any inappropriate contact with C.C., R.I., or M.G. He did agree to give C.C. a ride and did take her to his home. Mr. Griswold spoke to C.C. at her mother's request because her mother was concerned about her boyfriend's bad influence. Mr. Griswold testified he discussed sex with C.C. in

this context alone. He took condoms from her as a kind of "moral policeman" when she showed them to him to explain why she would not get pregnant by having sex with her boyfriend. The student who stopped by Mr. Griswold's house testified that everything looked normal to him. The defense argued that C.C. was angry with Mr. Griswold because he interfered with her boyfriend and would not date her mother. The defense witnesses pointed out discrepancies in C.C.'s testimony. Mr. Griswold also argued C.C., R.I., and M.G. were part of a conspiracy against him with a former wife to gain an advantage in an ongoing visitation dispute.

The trial court heard and rejected Mr. Griswold's offer of proof by question and answer of Tana Wood. Ms. Wood, Superintendent of the Washington State Penitentiary, employed Mr. Griswold as a prison guard. Ms. Wood was asked whether she was "acquainted with Jeff Griswold's reputation as to general moral character." Ms. Wood, responded, "Actually he has a very positive reputation at the penitentiary." She was then asked if she was "aware of anything in the way of a negative character or reputation as regards to his moral, his sexual moral character." Ms. Wood responded, "I am not."

The court also rejected five other witnesses by oral offer of proof. Each knew Mr. Griswold from one to five years. According to the offer, they were prepared to "testify substantially similarly to Tana Wood." One was a fellow employee. The others knew Mr. Griswold through Tae kwon do. The offer of proof as to the five was for the purpose of relating reputation for good [g]eneral moral character and specifically, his sexual moral character." The trial court concluded this type of reputation evidence was generally not admissible rather than considering the specific offers of proof.

The trial court rejected Mr. Griswold's attempts to cross-examine C.C. and her mother about a specific incident of alleged lying. The incident related to why C.C. was unable to continue helping on her friend's paper route. C.C.'s

mother had stated under oath at a previous hearing that C.C. had quit her paper route because she feared Mr. Griswold. At an interview, C.C. admitted that she lost the job because she and her friend occasionally threw away the papers rather than delivering them. Mr. Griswold wanted to show either that C.C.'s mother lied or that C.C. lied to her mother. The court decided the matter was collateral.

The jury found Mr. Griswold guilty as charged. Mr. Griswold appealed.

## ANALYSIS
### A. Prior Bad Acts

The issue is whether the trial court erred by abusing its discretion when admitting evidence under ER 404(b) of prior bad acts involving R.I. and M.G. and concluding the prior acts showed a common scheme or plan.

■■ The trial court's decision to admit evidence is reviewed for an abuse of discretion. *See State v. Carleton*, 82 Wn. App. 680, 684, 919 P.2d 128 (1996). ER 404(b) states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Before a court admits evidence under this rule, it must (1) identify the purpose for introducing the evidence, (2) determine relevancy to an element of the crime charged, (3) weigh the probative value against its prejudicial effect, and (4) decide if the evidence preponderates that the misconduct actually occurred. *State v. Lough*, 125 Wn.2d 847, 853, 889 P.2d 487 (1995). Mr. Griswold focuses on factors one and three.

■ The trial court admitted the testimony to show common scheme or plan. Prior bad acts may constitute a plan

or scheme (1) "where several crimes constitute constituent parts of a plan in which each crime is but a piece of the larger plan" or (2) "when an individual devises a plan and uses it repeatedly to perpetrate separate but very similar crimes." *Lough*, 125 Wn.2d at 855. Under alternative two, "a common design or plan can be established by evidence reflecting that the defendant committed 'markedly similar acts of misconduct against similar victims under similar circumstances.' " *Id.* at 855-56 (quoting *People v. Ewoldt*, 7 Cal. 4th 380, 399, 867 P.2d 757, 767, 27 Cal. Rptr. 2d 646, 656 (1994)). This may be shown when "the defendant has performed acts having 'such a *concurrence of common features* that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.' " *Lough*, 125 Wn.2d at 856 (quoting 2 JOHN HENRY WIGMORE, EVIDENCE § 304, at 249 (James H. Chadbourn ed., rev. ed. 1979)). The prior misconduct must show a " 'strong indication of a design (not a disposition).' " *Lough*, 125 Wn.2d at 858-59 (quoting WIGMORE, § 375, at 335).

In *Lough*, the defendant was charged with drugging a woman and raping her while she was unconscious. The trial court permitted the State to introduce evidence that the defendant had drugged and raped other women in the same manner over a time period of about 10 years. *Lough*, 125 Wn.2d at 850-52. The Supreme Court affirmed. *Id.* at 865.

Division One has subsequently applied *Lough* to cases of alleged prior sexual abuse of children and teenagers. *See State v. Baker*, 89 Wn. App. 726, 950 P.2d 486 (1997), *review denied*, 135 Wn.2d 1011 (1998); *State v. Krause*, 82 Wn. App. 688, 694, 919 P.2d 123 (1996), *review denied*, 131 Wn.2d 1007 (1997); *Carleton*, 82 Wn. App. at 684. In *Baker*, the defendant was convicted of first degree child molestation of an eight-year-old victim. The victim testified that she slept in a bed with the defendant, he rubbed her back until she went to sleep and she awoke when she felt him massaging her vagina with his hand through her clothes. *Baker*, 89 Wn. App. at 733. The trial court permitted a wit-

ness to testify to similar conduct when she was between the ages of 7 and 11. *Id.* Division One agreed the prior bad acts showed a common scheme or plan. The court relied on the strong similarities in the relationships, ages, and the touching described by the victim and the witness. *Id.* at 733-34. Division One has reached similar results in other decisions. *See Krause*, 82 Wn. App. at 694 ("systematic scheme" indicated design to sexually abuse where defendant would gain access to young boys by befriending their parents and working to gain the boys' affections); *Carleton*, 82 Wn. App. at 684 ("markedly similar conduct" where defendant repeatedly described himself as having a homosexual alternate personality to initiate sexual contact).

Division Two has criticized Division One's application of *Lough* as allowing mere propensity evidence. *State v. Dewey*, 93 Wn. App. 50, 57, 966 P.2d 414 (1998), *review denied*, 137 Wn.2d 1024 (1999). The *Dewey* court reasoned that *Krause* and *Carleton* failed to discuss "whether the *Lough* common features had to be unique or uncommon to the way in which the crimes are typically committed." *Dewey*, 93 Wn. App. at 57.

Here, the trial court following *Lough* reasoned the repeated and unique use of the truth or dare games indicated a common scheme that tended to show Mr. Griswold's design to molest. Under *Dewey* this is atypical conduct. While we agree with the *Dewey* court, it is hard to envision using prior bad act evidence without also raising the specter of showing mere propensity evidence; the balance is to be struck by the trial court using the *Lough* factors as a guide. Once the trial court strikes the balance in favor of admission and states tenable grounds, the court should give limiting instructions to direct the jury to disregard the propensity aspect of the evidence and focus solely on its evidentiary effect tending to show common scheme or plan. Here, the court struck the balance in favor of admission and stated tenable reasons by noting the uniqueness of the truth or dare plan. The court then gave proper limiting instructions prior to the testimony of each bad act

witness and in the final jury instructions. Thus, we conclude the trial court properly followed *Lough* and is not subject to the criticism made in *Dewey.*

The trial court noted further supporting similarities. Mr. Griswold acted in each instance using positions of trust, respect, or authority. Mr. Griswold was (1) a respected martial arts instructor to C.C., (2) uncle to R.I., and (3) friend to M.G.'s father. Further, the court found similarities in ages "somewhere between pubescent and adolescent." The trial court found similarity in locations. R.I. and C.C. were victimized in Mr. Griswold's home and with M.G., the touching allegedly occurred in Mr. Griswold's home and car. Finally, the court found similarity in the escalating touching accomplished by similar game playing. Although these similarities are not remarkable individually, the repeated pattern combined with the unique truth or dare ploy demonstrate a plan devised and used repeatedly to perpetrate separate but similar crimes fitting within the second *Lough* alternative.

■ Mr. Griswold next contends the prior incidents were too remote in time to show a common scheme or plan. *See State v. Bouchard,* 31 Wn. App. 381, 386, 639 P.2d 761, *review denied,* 97 Wn.2d 1021 (1982). However, "while passage of time may in some cases be a factor, the passage of a number of years may be without real significance if the older offense is part of a 'pattern' of similar misconduct occurring over a number of years." *Lough,* 125 Wn.2d at 858 (citing *State v. Wermerskirchen,* 497 N.W.2d 235, 243 n.3 (Minn. 1993)). The *Lough* court held the trial court had properly admitted evidence of similar prior misconduct that was up to 10 years old because the evidence exhibited a larger design. *Lough,* 125 Wn.2d at 850-51, 861. In *Baker,* the court upheld the admission of testimony regarding prior misconduct occurring 11 to 15 years earlier. *Baker,* 89 Wn. App. at 729, 734. Here, as in *Baker* and *Lough,* the evidence revealed a pattern of conduct occurring over a number of years.

■ Mr. Griswold argues the probative value is out-

weighed by the prejudicial effect. A court should not admit prior bad act evidence except for a proper purpose and then when its probative value clearly outweighs its prejudicial effect. *Lough*, 125 Wn.2d at 862. The balancing is reviewed for an abuse of discretion. *Id.* at 863. The probative value outweighs the prejudice where: (1) the evidence is highly probative because it tends to show a common design or plan; (2) need for evidence is great given the nature of the allegations; and (3) the trial court gives the appropriate limiting instruction to the jury. *Krause*, 82 Wn. App. at 697.

Here, the trial court carefully weighed the prejudice and the probative value of the testimony on the record. The court noted the evidence was prejudicial to Mr. Griswold and the jury could erroneously consider it as proof of guilt. The court found the evidence highly probative because it tended to show a common scheme or plan. The evidence was the sole corroborating evidence offered by either side in what was otherwise a swearing match between C.C. and Mr. Griswold. The court also found that the need for the proof was particularly great because of the nature of the crime as explained in *Krause*. We conclude the trial court did not err by following *Lough*.

## B. Reputation Evidence

The issue is whether the trial court erred by refusing Mr. Griswold's offers of proof related to his reputation for good moral and sexual moral character under ER 404(a)(1).

Abuse of discretion remains our standard of review on questions related to admissibility of evidence. *State v. Stenson*, 132 Wn.2d 668, 701, 940 P.2d 1239 (1997), *cert. denied*, 523 U.S. 1008 (1998).

ER 404(a) provides:

> **Character Evidence Generally.** Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:

(1) *Character of Accused*. Evidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same.

In *State v. Thomas*, 110 Wn.2d 859, 757 P.2d 512 (1988), the defendant was convicted of third degree rape for raping a 14-year-old girl. At trial, three witnesses testified the defendant had a good reputation for being sexually moral and decent. *Id.* at 863. The trial court refused to instruct the jury that evidence of good character may be sufficient to create a reasonable doubt as to the defendant's guilt. *Id.* at 860-61. On appeal, the court approved the use of the following instruction: "Any evidence which bears upon good character and good reputation of the defendant should be considered by you, along with all other evidence, in determining whether or not the defendant is guilty." *Id.* at 867. *See also State v. Harper*, 35 Wn. App. 855, 859-60, 670 P.2d 296 (1983) (Division Two, dicta that evidence of sexual morality and decency is pertinent reputation evidence). *But see State v. Jackson*, 46 Wn. App. 360, 365, 730 P.2d 1361 (1986) (Division One, reputation for sexual morality and decency not pertinent reputation evidence, rejecting *Harper*).

Here, the trial court followed *Jackson* and excluded the testimony. The trial court found that *Jackson* was on point and that *Thomas* was merely dicta:

> I'm not going to allow [the testimony]. And were it not for the Jackson case I certainly would. I was very surprised that was the finding of the Jackson case. As a trial court I'm obliged to follow the law. We have a Court of Appeals decision that is absolutely on point.
>
> . . . .
>
> The Thomas case is dicta, because it does not, it doesn't focus on this issue. It focuses on the instruction. And while it is clear from that case that they did in fact allow it in, it simply is dicta.

■ Even though *Harper* is dicta, it is consistent with

*Thomas. Thomas* was announced after *Jackson.* We conclude *Thomas* and *Harper* represent viable reasoning that sexual morality is a pertinent character trait in cases such as the present one.

■ Although the trial court erred by rejecting any reputation evidence under *Jackson,* an analysis of the foundation reveals the evidence was nevertheless inadmissible. A defendant has a constitutional right to present a defense consisting of relevant and admissible evidence. *State v. Rehak,* 67 Wn. App. 157, 162, 834 P.2d 651 (1992), *cert. denied,* 508 U.S. 953 (1993). However, a proper foundation is necessary. *Id.* (evidence regarding a third party perpetrator).

Here, two different but related attempts to establish a foundation are before us. The first is the offer by question and answer related to Ms. Wood that was specifically for the purpose of showing "general moral character." The second is the oral offer related to five individuals who were prepared to "testify substantially similarly to Tana Wood" for the purpose of showing "[g]eneral moral character and specifically, his sexual moral character."

The first offer was for a purpose too broad to be admissible under *Thomas* and *Harper.* It is not specifically pertinent to the charge. General moral character relates to "principles of right and wrong in behavior" rather than sexual morality. WEBSTER'S COLLEGIATE DICTIONARY 756 (10th ed. 1995). The second offer suffers partly from its method of presentation. If the witnesses testified "substantially similarly to Tana Wood" the foundation is inadequate. No mention is made of Mr. Griswold's reputation for sexual moral character in Ms. Wood's testimony.

■ An offer of proof serves three purposes to meet the requirements of ER 103(a)(2). *State v. Ray,* 116 Wn.2d 531, 538, 806 P.2d 1220 (1991). First, it informs the court of the relevant legal theory under which evidence is offered. *Id.* Second, it gives the specific nature of the evidence so that the court can assess its admissibility. *Id.* Third, it creates a record for review. *Id.* Here, Mr. Griswold's oral offer is deficient to support the second and third *Ray* purposes.

The record is inadequate to know what knowledge the five persons possessed beyond that related by Ms. Wood.

■ Thus, even though the trial court denied admission based upon an incorrect conclusion that this kind of reputation testimony was legally inadmissible, we conclude that because the foundation was inadequate, the result excluding the evidence was not erroneous. An appellate court may affirm on other grounds after rejecting a trial court's reasoning. *See State v. Michielli*, 132 Wn.2d 229, 242, 937 P.2d 587, 71 A.L.R.5TH 705 (1997).

## C. Impeachment Evidence

The issue is whether the trial court erred by refusing to admit impeachment under ER 608(b) of C.C. and her mother by use of misstatements regarding why C.C. was not able to continue with helping her friend deliver papers and concluding the matter was collateral.

The standard for review remains unchanged, and a trial court's admission or exclusion of evidence is reviewed for an abuse of discretion. *See State v. Wilson*, 60 Wn. App. 887, 890, 808 P.2d 754, *review denied*, 117 Wn.2d 1010 (1991).

■ ER 608(b) states:

Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

Washington case law allows cross-examination under ER 608(b) into specific instances that are relevant to veracity. *Wilson*, 60 Wn. App. at 893. " 'Any fact which goes to the

trustworthiness of the witness may be elicited if it is germane to the issue.' " *Id.* (quoting *State v. York*, 28 Wn. App. 33, 36, 621 P.2d 784 (1980)).

Mr. Griswold relies on *Wilson* for his contention. In *Wilson*, the trial court permitted the State to cross-examine the defendant's witness regarding a prior false statement she made under oath. *Wilson*, 60 Wn. App. at 891. On appeal, the court held the prior statement came within ER 608(b). *Wilson*, 60 Wn. App. at 893. The court reasoned the prior false statement was not only relevant to the witness's credibility but also germane to the issue of sexual abuse. *Id.* It was germane because the witness testified that the defendant could not have committed sexual abuse and because the testimony corroborated the defendant's testimony. *Id.*

The present case is distinguishable. Here, assuming the prior false statement is relevant to C.C.'s credibility, her prior false statement is not germane to the guilt issues here. Thus, the trial court properly concluded: "It is clearly collateral. . . . I'm not going to have a mini trial here as to whether or not she got fired from a paper route. It has nothing to do with the issues at hand."

### D. Cumulative Error

Mr. Griswold contends the cumulative effect of the court's errors requires reversal. Because we have rejected each of Mr. Griswold's contentions it is unnecessary to address cumulative error. *State v. Russell*, 125 Wn.2d 24, 93-94, 882 P.2d 747 (1994), *cert. denied*, 514 U.S. 1129 (1995).

### CONCLUSION

We hold the trial court did not err admitting evidence under ER 404(b) of prior bad acts. Although we hold Mr. Griswold's reputation for sexual morality is relevant here, Mr. Griswold's foundation testimony was inadequate. Finally, the trial court did not err excluding impeachment on a collateral matter.

Affirmed.

KURTZ, C.J., and KATO, J., concur.