119 P.3d 806 (2005)
STATE of Washington, Respondent,
v.
Courtney James O'CONNOR, Petitioner.
No. 75023-8.
Supreme Court of Washington, En Banc.
Argued October 28, 2004.
Decided September 15, 2005.
*807 Carla Barbieri Carlstrom, Julie Dee Cook, James Morrissey Whisman, King County Prosecutor's Office, Seattle, for State of Washington.
Kitteridge Oldham, Buck & Gordon, LLP, Christopher Gibson, Seattle, for Courtney James O'Connor.
BRIDGE, J.
¶ 1 Courtney James O'Connor was accused of slashing the tires on a vehicle owned by Rachel Bologna, with whom he had had a dating relationship. Investigators discovered that O'Connor gave Bologna several hundred dollars to replace the tires. O'Connor moved to exclude evidence of his payment under Evidence Rule (ER) 408, but the trial court disagreed and both Bologna and O'Connor testified about the payment at trial. The jury found O'Connor guilty of second degree malicious mischiefdomestic violence.
¶ 2 On appeal, O'Connor argued that evidence regarding his compromise, in the form of payment for the tires, should have been excluded under ER 408. State v. O'Connor, 119 Wash.App. 530, 536, 81 P.3d 161 (2003) (published in part). The Court of Appeals concluded that ER 408 applies in criminal trials only where the criminal offense charged is a misdemeanor subject to compromise under chapter 10.22 RCW. Id. at 548, 81 P.3d 161. Because O'Connor's offense did not qualify, his payment to Bologna was properly admitted. Id.
¶ 3 O'Connor now argues the Court of Appeals erred when it refused to hold that ER 408 was applicable in his criminal trial. He also claims that his constitutional right to confront witnesses was violated when he was not allowed to cross-examine Bologna about a claim she made to her insurance company to pay for the damaged tires.
¶ 4 We conclude that ER 408 does not apply in criminal trials even where the charged offense is subject to compromise. Thus, evidence of O'Connor's payment to Bologna and statements he made with regard to that payment were properly admitted at trial. In addition, we conclude that in the context of these proceedings, it was within the trial court's discretion to exclude evidence that the victim received money both from O'Connor and from her insurance company. We affirm the Court of Appeals and uphold O'Connor's conviction.

I

Facts and Procedural History
¶ 5 In 2001, Bologna and O'Connor dated for several months, though not in an exclusive relationship. According to Bologna, on November 7, 2001 she was studying for graduate entrance exams when O'Connor called and asked to see her. She refused. O'Connor called her again late that evening and insisted on coming to her home to pick up a compass that he had loaned to her. She reiterated that she did not want to see him but agreed to leave the compass in the mailbox. As she was going back inside, she saw O'Connor in the vicinity of her car, which was parked near the street in front of her house, but she did not see anything suspicious. Soon after, O'Connor called Bologna *808 again from his cell phone. He stated that he did not think that things were working out between them and Bologna agreed.
¶ 6 The next day, Bologna discovered that all of the tires on her car had been slashed. Bologna called O'Conner and accused him of damaging her tires, but he denied doing so. She told him that she was going to call the police "if this didn't get taken care of," and he told her to go ahead. Verbatim Report of Proceedings (RP) (Apr. 16, 2002) at 24. Bologna contacted police, and a detective first spoke with O'Connor on November 9.
¶ 7 A couple of days later, about one week after Bologna's tires were slashed, O'Connor gave her $800, "apologized for everything," and stated that the money was to "make everything right." RP (Apr. 16, 2002) at 27-28. However, he did not admit to slashing the tires.
¶ 8 The detective talked to O'Connor again a couple of days after he had given money to Bologna. O'Connor told the detective that he had provided financial assistance to Bologna to replace the tires and that he "considered the matter settled." RP (Apr. 16, 2002) at 46. O'Connor also told the detective to do whatever was "appropriate or necessary, but he considered [the matter] closed." RP (Apr. 16, 2002) at 46-47. O'Connor did not admit to the detective that he had slashed the tires. The detective then talked to Bologna, who said that she had replaced the tires with the money provided by O'Connor, and she preferred at that point to "let the matter rest." RP (Apr. 16, 2002) at 48.
¶ 9 The State charged O'Connor with one count of malicious mischief in the second degreedomestic violence for slashing the tires. The domestic violence charge was based on the dating relationship between O'Connor and Bologna. Prior to trial, O'Connor moved to exclude evidence of the $800 he gave to Bologna, pursuant to ER 408. The trial court denied the motion, reasoning that O'Connor's statements were admissible as admissions against interest.
¶ 10 After the trial court ruled that evidence of O'Connor's $800 payment to Bologna was admissible, the State moved to exclude evidence that Bologna received money for the tires both from O'Connor and from her insurance company. Defense counsel argued that he should be able to cross-examine Bologna on the subject in order to impeach her credibility. He asserted that the fact that Bologna received and retained about $300 more than she spent to replace the tires "goes to her credibility, her ability to tell the truth on the stand." RP (Apr. 15, 2002) at 13. The trial court reserved ruling until it could hear Bologna testify as to the chronology of the payments.
¶ 11 Bologna then testified outside of the presence of the jury that she filed a claim with her insurance company about three days after her tires were slashed. At about the same time, she had her car towed and the tires repaired; her total expenses amounted to about $1,000. A couple of days later, O'Connor gave her $800 and apologized to her. She later received $500 from her insurance company.
¶ 12 After this testimony, defense counsel again sought to attack Bologna's credibility because she had accepted a total of $1,300 for the tires. The State replied that because Bologna filed a claim with her insurance company before she received any money from O'Connor, she had not set out to defraud her insurance company, and her retention of the extra $300 was relevant only to her character and not to whether she was more likely than not testifying truthfully.
¶ 13 The trial court agreed, ruling that:
[I]t appears from her testimony that she received the money from Mr. O'Connor after she had filed a claim with her insurance company but before she received any money from the insurance company. That being the case, arguably the $800 that Mr. O'Connor paid to her was owing at the time the payment was made, and I think the issue of whether or not she took advantage of the insurance company is an independent issue, which goes to her character, does not go to the credibility in the sense of it being materially relevant to the commission of the crime.
It would be different if in fact the insurance company paid off and then she received the money from Mr. O'Connor. .... [I]t appears to the Court that even *809 though it might in some sense be relevant to Ms. Bologna's credibility, that it really is a character issue rather than a credibility issue, given the specific facts of this case, as they were presented to the Court, and that will be suppressed.
RP (Apr. 16, 2002) at 14-15.
¶ 14 At trial, O'Connor claimed that he had not called Bologna or gone to her house on the night in question.[1] He testified that he told the detective, "I'm not admitting this. I had nothing to do with this. And I told him at the time that I had taken care of the situation maturely, and that I encouraged him to continue on with the investigation." Id. at 57. However, O'Connor could not offer an explanation for what "situation" he was referring to, other than the slashed tires. O'Connor testified that he gave the money to Bologna specifically to pay for the tires in order to "try to help her" because he still had feelings for her. Id. at 58. He claimed that at the time he gave Bologna the money for the tires, he did not know that the police were investigating the crime. The detective's testimony, however, contradicted this assertion; the detective explained that only two days after the incident, he told O'Connor that he was conducting a criminal investigation. On O'Connor's cross-examination, the prosecutor emphasized the ridiculousness of the notion that he would give Bologna $800 out of kindness if she had falsely accused him of slashing her tires.
¶ 15 Bologna testified O'Connor did not specifically tell her that the $800 was to replace the tires, but he said it was "[t]o make everything right." Id. at 28. Even so, the detective testified that O'Connor gave Bologna the money specifically to replace the tires. Finally, in closing argument, defense counsel argued that O'Connor gave the money to Bologna specifically to pay for the tires. Thus, the State's case was based not only on Bologna's testimony but also on the detective's testimony (in which he recounted his conversations with O'Connor), as well as O'Connor's explanation of why he gave Bologna the money.
¶ 16 The jury found O'Connor guilty of second degree malicious mischiefdomestic violence. He appealed and the Court of Appeals affirmed. O'Connor, 119 Wash.App. 530, 81 P.3d 161. The Court of Appeals held that ER 408 applies in criminal trials but only to the extent that the offense charged is a misdemeanor subject to compromise under chapter 10.22 RCW. Id. at 548, 81 P.3d 161. Because O'Connor's offense did not meet the requirements of chapter 10.22 RCW, ER 408 did not apply to his criminal trial. Id. O'Connor filed a petition for review in this court, which we granted at 152 Wash.2d 1006, 99 P.3d 896 (2004).

II

Analysis

Applicability of ER 408 in Criminal Trials
¶ 17 Evidence Rule 410 makes evidence of criminal plea negotiations inadmissible in both civil and criminal trials. However, that rule does not address negotiations or compromise between a criminal defendant and a victim in efforts to compromise a potential civil claim. See ER 410. Thus, O'Connor turns to ER 408, arguing that it can be applied in criminal trials, as well as in civil trials, to exclude compromise or offers to compromise between a criminal defendant and a victim. ER 408 provides:
Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, *810 such as proving bias or prejudice of a witness, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.
O'Connor argues that evidence of his $800 payment to Bologna, as well as his statements and conduct relating to that payment, should have been excluded under this rule.
¶ 18 Federal courts have wrestled with whether the nearly identical federal rule applies in federal criminal cases and have reached differing conclusions. See Federal Rule of Evidence (FRE) 408; O'Connor, 119 Wash.App. at 537, 81 P.3d 161 (explaining that Washington's ER 408 differs from the federal rule only in style). The Fifth and Tenth Circuits have held that the rule applies in criminal actions, and the Ninth Circuit assumed so in one case, without directly addressing the issue. United States v. Bailey, 327 F.3d 1131, 1146 (10th Cir.2003); United States v. Sayakhom, 186 F.3d 928, 945 (9th Cir.1999); United States v. Hays, 872 F.2d 582, 589 (5th Cir.1989). However, the Second, Sixth and Seventh Circuits have held that the rule applies only in civil proceedings. United States v. Logan, 250 F.3d 350, 367 (6th Cir.2001); Manko v. United States, 87 F.3d 50, 53-54 (2d Cir.1996); United States v. Prewitt, 34 F.3d 436, 439 (7th Cir.1994); United States v. Baker, 926 F.2d 179, 180 (2d Cir.1991). Courts in other states have also come to opposing conclusions. Compare, e.g., State v. Gano, 92 Hawai'i 161, 988 P.2d 1153, 1160 (1999) (rule applies in both civil and criminal trials) with, e.g., State v. Mead, 2001 UT 58, 27 P.3d 1115, 1128 (rule does not apply in criminal trials); Mayes v. State, 1994 OK CR 44, 887 P.2d 1288, 1309 (same).
¶ 19 Interpretation of a court rule is a question of law, subject to de novo review. Nevers v. Fireside, Inc., 133 Wash.2d 804, 809, 947 P.2d 721 (1997). In determining the meaning of a court rule, we apply the same principles used to determine the meaning of a statute. City of Bellevue v. Hellenthal, 144 Wash.2d 425, 431, 28 P.3d 744 (2001). Foremost, we construe court rules in accord with the intent of the drafting body. Id.
¶ 20 We consider first the plain language of the rule. See id. Critical language in ER 408 suggests that the rule does not apply in criminal cases. The rule states that evidence of settling or attempting to settle a claim is not admissible "to prove liability for or invalidity of the claim or its amount." ER 408 (emphasis added). This key language suggests that the rule applies only in civil cases where "liability" or "invalidity of the claim" would be at stake, as opposed to guilt or innocence. See Logan, 250 F.3d at 367; Prewitt, 34 F.3d at 439; Baker, 926 F.2d at 180; Mayes, 887 P.2d at 1309.
¶ 21 However, O'Connor points to the last sentence of the rule, which provides, in part, that ER 408 does not require exclusion of evidence when the evidence is offered for another purpose such as "proving an effort to obstruct a criminal investigation or prosecution." ER 408. O'Connor argues that this language would be superfluous if the rule does not apply in criminal trials. Yet the State points out that an effort to obstruct a criminal investigation could be relevant to a civil trial. For example, a rape victim could sue the rapist following acquittal or dismissal of the criminal charges and evidence that the rapist attempted to obstruct the criminal prosecution could be used to prove liability in the civil suit.
¶ 22 O'Connor also emphasizes ER 1101, which provides that the Evidence Rules apply "to all actions and proceedings in the courts of the state of Washington" subject to limited exceptions not applicable here. ER 1101(a), (c); see also State ex rel. Citizens Against Tolls v. Murphy, 151 Wash.2d 226, 242, 88 P.3d 375 (2004) (examination of related statutes or provisions in the same legislation is appropriate to determine whether meaning is plain). While some federal courts have found that the FRE 1101 supports the conclusion that FRE 408 applies to criminal trials, see, e.g., Bailey, 327 F.3d at 1145-46, the courts that have held that FRE 408 does not apply in criminal cases have done so despite FRE 1101. See Logan, 250 F.3d at 367; Manko, 87 F.3d at 54-55; Prewitt, 34 F.3d at 439; Baker, 926 F.2d at 180 (all holding ER 408 applies only in civil proceedings). Moreover, Washington's ER 410, *811 which addresses inadmissibility of pleas, offers of pleas, and related statements, expressly provides that it applies "in any civil or criminal proceeding" while ER 408 does not do so. The difference in language between ER 408 and ER 410, and ER 410's clear application to both criminal and civil proceedings, indicate that ER 408 does not apply in criminal trials. See, e.g., Baker, 926 F.2d at 180 (noting that the very existence of the federal rule excluding plea negotiations strongly supports the conclusions that FRE 408 applies only in civil cases).[2]
¶ 23 But while the language of ER 408 and related rules as a whole support the conclusion that the rule applies only in civil actions, the last clause of ER 408, allowing evidence to be admitted if it proves an effort to obstruct a criminal investigation, does create some ambiguity. Therefore, we look to the rule's history for other indicia of intent. See Citizens Against Tolls, 151 Wash.2d at 242-43, 88 P.3d 375 (where a statute is ambiguous, the court can resort to legislative history and other aids for discerning intent).
¶ 24 In 1976 the Washington Judicial Council conducted a study of the federal rules of evidence and composed judicial council comments to accompany the proposed Washington Evidence Rules. 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 101.7, at 10-11 (4th ed.1999). ER 408 was adopted in 1979 as one of Washington's Evidence Rules. Id.; 5A KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 408.1, at 49 (4th ed.1999). Although this court did not adopt the judicial council comments when adopting Washington's Evidence Rules, we have frequently cited them for their explanations of the rules. 5 TEGLAND, supra, § 101.7, at 10; State v. Neal, 144 Wash.2d 600, 610, 30 P.3d 1255 (2001); Weyerhaeuser Co. v. Commercial Union Ins. Co., 142 Wash.2d 654, 683 n. 14, 15 P.3d 115 (2000); Ashley v. Hall, 138 Wash.2d 151, 155-56, 978 P.2d 1055 (1999).
¶ 25 Prior to the adoption of ER 408, offers of settlement in civil actions were inadmissible to prove liability. ER 408 cmt., 91 Wn.2d 1138 (citing Eagle Ins. Co. v. Albright, 3 Wash.App. 256, 474 P.2d 920 (1970)). The first sentence of ER 408 "codifie[d] the common law rule that evidence of an offer to compromise a claim is inadmissible to prove liability or lack thereof." Id. However, the second sentence of ER 408, ("[e]vidence of conduct or statements made in compromise negotiations is likewise not admissible,") changed Washington law; conduct and statements made in compromise negotiations had previously been admissible as admissions of a party opponent. Id. The evidence rule made such conduct and statements inadmissible "based on the policy of promoting complete freedom of communication in compromise negotiations." Id. The comment also emphasizes that ER 408 changed Washington law "only with respect to the admissibility of statements made in compromise negotiations." Id. (emphasis added).
¶ 26 This fact has great significance when considered against the backdrop of decisional law predating the rule. At the time, evidence of attempts to pay victims of crimes was admissible in criminal trials. In State v. Bruemmer, 133 Wash. 579, 234 P. 448 (1925), evidence was presented in Bruemmer's criminal trial for theft by misrepresentation that the defendant had offered to refund the victim's money. Id. at 579-80, 234 P. 448. The court concluded that the offer to compromise was admissible, stating that "[t]he rule is well settled that offers of compromise are inadmissible in civil cases, but in criminal cases offers of restitution may be offered to the jury with all attendant circumstances." Id. at 580, 234 P. 448; see also State v. Humphreys, 118 Wash. 472, 475, 203 P. 965 (1922) (discussing admission of the defendant's offer to pay for stolen wheat). The *812 commentary accompanying ER 408, explaining that the second sentence of ER 408 was the only change to Washington law, reveals that ER 408 was not intended to change the rule that offers of restitution between the criminal defendant and the victim are admissible in criminal trials.[3]
¶ 27 Moreover, we note that the second sentence of ER 408 does not stand alone; it relates back to the first sentence by stating that evidence of conduct or statements made in compromise negotiations is "likewise not admissible." ER 408. As stated above, the plain language of the first sentence does not pertain to admissibility in criminal trials. Thus, the second sentence of the rule made conduct and statements made during civil negotiations inadmissible in civil trials and this was the only change in Washington law enacted by the rule.
¶ 28 O'Connor maintains that the policy and purpose of ER 408 to encourage civil settlements cannot be achieved unless the rule applies in all proceedings, civil and criminal. However, we note that had the legislature believed that, as a matter of public policy, settling civil cases overrides the policy of prosecuting criminal offenders, the legislature could have provided for the compromise of all crimes, not just certain misdemeanors. See RCW 10.22.010.[4] Yet, the legislature did not do so and instead prohibited compromise of crimes outside of those misdemeanors included in chapter 10.22 RCW. RCW 10.22.030. We agree with the federal courts that have reasoned that the policy favoring civil settlements, though sufficient in a civil case to bar evidence relating to settlements and offers to settle, is insufficient in criminal cases "where the stakes are higher." E.g., Manko, 87 F.3d at 54. When weighed directly against the public interest in the settlement of civil suits, the public interest in the disclosure and prosecution of crimes is certainly greater. Encouraging settlement of a civil matter surely "does not justify excluding probative and otherwise admissible evidence in criminal prosecutions." United States v. Gonzalez, 748 F.2d 74, 78 (2d Cir.1984); see also Logan, 250 F.3d at 367 (risk of chilling effect on civil settlement negotiations heavily outweighed by the public interest in prosecuting criminal matters); Prewitt, 34 F.3d at 439 (same).[5]
¶ 29 Finally, we disagree with the Court of Appeals to the extent that it concluded that ER 408 applies in criminal trials where the offense charged is a misdemeanor subject to compromise and the attempt to compromise has failed or the court declines to dismiss the prosecutions. See O'Connor, 119 Wash.App. at 545, 81 P.3d 161. Chapter 10.22 RCW simply does not concern admissibility of evidence, and neither do the domestic violence statutes to which the Court of Appeals also referred. See RCW 10.99.010-.070.
*813 ¶ 30 Given the language of ER 408, the comments accompanying the rule, its history and Washington's common law, and the public interest in prosecuting offenders under the criminal law, we conclude that ER 408 does not apply in criminal trials.

Confrontation
¶ 31 O'Connor also argues that the trial court abused its discretion when it did not allow him to cross-examine Bologna about her recovery from the insurance company. Both the United States Constitution and the Washington State Constitution guarantee criminal defendants the right to confront and cross-examine adverse witnesses. U.S. CONST. amend. VI; Wash. Const. art. 1, § 22; see also State v. Smith, 148 Wash.2d 122, 131, 59 P.3d 74 (2002). Although the right to confrontation should be zealously guarded, that right is not without limitation. State v. Darden, 145 Wash.2d 612, 621, 41 P.3d 1189 (2002) (the right to confrontation is not absolute). The right to confrontation, and the associated right to cross-examine adverse witnesses, are limited by general considerations of relevance. Id. There is no constitutional right to admission of irrelevant evidence. Id. at 624, 41 P.3d 1189.
¶ 32 Evidence of a witness's character, trait of character, or other wrongs or acts are "not admissible for the purpose of proving action in conformity therewith on a particular occasion" except as provided in ER 607, 608, and 609. ER 404(a)(3). ER 608 provides that specific instances of a witness's conduct, introduced for the purpose of attacking his or her credibility, may not be proved by extrinsic evidence, but may "in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross examination of the witness ... concerning the witness' character for truthfulness or untruthfulness." ER 608(b) (emphasis added).[6] In exercising its discretion, the trial court may consider whether the instance of misconduct is relevant to the witness's veracity on the stand and whether it is germane or relevant to the issues presented at trial. State v. Griswold, 98 Wash.App. 817, 830-31, 991 P.2d 657 (2000) (the witness's prior false statement was "`clearly collateral'" and "not germane to the guilt issues here"); State v. Wilson, 60 Wash.App. 887, 893, 808 P.2d 754 (1991) ("`Any fact which goes to the trustworthiness of the witness may be elicited if it is germane to the issue.'") (quoting State v. York, 28 Wash.App. 33, 36, 621 P.2d 784 (1980)).
¶ 33 For example, in Griswold the defendant was accused of molesting a 14-year-old girl. 98 Wash.App. at 830-31, 991 P.2d 657. The victim's mother testified that the victim quit her paper route because she was afraid of the defendant, but later the victim admitted that she lost the job because she occasionally threw the papers away instead of delivering them. Id. at 822, 991 P.2d 657. The Court of Appeals concluded that even though the victim had been dishonest about the paper route, the issue was collateral and not relevant to the guilt issues in that case. Id. at 831-32, 991 P.2d 657.[7]
*814 ¶ 34 Furthermore, the York court (from which the Wilson court drew its rule) first evaluated "whether [the] evidence [at issue] was merely collateral to the questions presented." York, 28 Wash.App. at 35, 621 P.2d 784. Thus, the York, Wilson, Griswold line of cases contemplates consideration of whether the evidence sought to be explored during cross-examination under ER 608(b) is relevant to the issue at hand. Prohibiting the trial court from considering the issue of germaneness to the issue at hand when exercising its discretion under ER 608 could result in a system under which a trial court is constitutionally required to admit any instance of a key witness's prior misconduct. But this result would be clearly contrary to ER 608, which grants trial courts discretion to make such determinations. In addition, Washington courts have been clear that not every instance of a witness's (even a key witness's) misconduct is probative of a witness's truthfulness or untruthfulness under ER 608(b). See, e.g., State v. Benn, 120 Wash.2d 631, 651, 845 P.2d 289 (1993) (witness's drug dealing "did not impact [his] ability to relate his discussions with Benn on the witness stand"); State v. Cochran, 102 Wash.App. 480, 486-87, 8 P.3d 313 (2000); State v. Kunze, 97 Wash.App. 832, 859-60, 988 P.2d 977 (1999) ("Specific instances of lying may be admitted whether sworn or unsworn, but their admission is highly discretionary under ER 608(b).") (emphasis added).
¶ 35 While this court has reasoned that "[f]ailing to allow cross-examination of a state's witness under ER 608(b) is an abuse of discretion if the witness is crucial and the alleged misconduct constitutes the only available impeachment," State v. Clark, 143 Wash.2d 731, 766, 24 P.3d 1006 (2001), we relied on York to support this reasoning. Again, in that case, the Court of Appeals stressed the crucial nature of the witness's testimony but also explained that the subject of cross-examination was "germane to the issue" on trial. York, 28 Wash.App. at 34-36, 621 P.2d 784. Moreover, in this case there were other avenues for challenging Bologna's credibility. Bologna was cross-examined regarding inconsistencies between her statements to the responding police officer and the investigating detective. RP (Apr. 16, 2002) at 30. The defense also emphasized the fact that she did not see O'Connor slash the tires. Id. at 33, 621 P.2d 784.[8]
¶ 36 Thus, we must consider whether the fact that Bologna kept the entire $1,300 was relevant to her veracity on the stand and relevant to facts at issue in this case. Discretion is abused when a decision is manifestly unreasonable or based upon untenable grounds. State v. Powell, 126 Wash.2d 244, 258, 893 P.2d 615 (1995). The trial court should be reversed only if no reasonable person would have decided the matter as the trial court did. State v. Thomas, 150 Wash.2d 821, 856, 83 P.3d 970 (2004).
¶ 37 O'Connor claims that the evidence of Bologna's recovery from the insurance company was relevant and probative of her truthfulness for two reasons. First, he asserts that if Bologna accepted money from her insurance company, then she must not have considered O'Connor's payment as compensation for damaged tires. This argument was never raised by defense counsel at trial. Moreover, both O'Connor and his counsel asserted at trial that the $800 payment was made to replace the tires; this fact was simply undisputed. The only point of contention was whether O'Connor gave Bologna money for the tires because he slashed them or simply out of a desire to help with the expense. Given that O'Connor admitted that the money was for replacement tires, Bologna's retention of the excess funds does not make it any more or less probable that O'Connor slashed the tires.
¶ 38 Second, O'Connor asserts, as defense counsel did at trial, that Bologna's failure to reimburse either him or the insurance company the excess $300 established that Bologna was dishonest. Because O'Connor denies *815 ever having visited Bologna's house on the night her tires were slashed, O'Connor argues that Bologna's retention of the excess $300 makes it more likely that Bologna would lie about him being outside her house on the night in question.
¶ 39 As discussed above, in exercising its discretion under ER 608, a trial court may consider whether the proposed subject of cross-examination is relevant to the witness's veracity on the stand and germane to the issues in question at trial. While the retention of the $300 may reflect an instance of dishonesty, it did not involve a lie under oath. Contrast with McDaniel, 83 Wash.App. at 186, 920 P.2d 1218. Nor did it necessarily involve O'Connor at all since the insurance payment was received after O'Connor gave the money to Bologna. Moreover, the retention of the excess $300 was not germane to the key factual issue to which Bologna testified, namely the fact that O'Connor was outside her house on the night her tires were slashed. Fundamentally, it is reasonable to conclude that the insurance payment is not relevant to the ultimate question of whether O'Connor slashed the tires. Therefore, the trial court acted within its discretion when it determined that the retention of the excess $300 was not probative of Bologna's truthfulness on the stand because it was simply too attenuated from her testimony regarding the events on the night in question. The trial court did not abuse its discretion when it refused to allow O'Connor to cross-examine Bologna regarding the insurance money.

III

Conclusion
¶ 40 Based on the language of ER 408, the comments accompanying the rule, its history and Washington's common law, and the public interest in prosecuting offenders under the criminal law, we conclude that ER 408 does not apply in criminal trials. We also conclude that the trial court did not abuse its discretion when it refused to allow O'Connor to cross-examine Bologna regarding the insurance money. Therefore, we affirm the Court of Appeals and uphold O'Connor's conviction.
WE CONCUR: ALEXANDER, C.J., OWENS, FAIRHURST, and IRELAND, J. Pro Tem.
C. JOHNSON, J. (dissenting).
¶ 41 The majority incorrectly concludes that the exclusionary protections of ER 408 apply only to civil cases. In order to protect a victim's right to prompt civil settlement, the directives of the civil rules generally, and the language and intent of ER 408 specifically, make ER 408 applicable to criminal as well as civil proceedings. Otherwise, settlement negotiations would be discouraged in many civil cases. Even in a routine traffic accident, an offer to settle could incriminate the defendant in a later criminal proceeding.
¶ 42 ER 1101(a) provides that the evidence rules apply to both civil and criminal proceedings; ER 408 expressly references applicability to criminal prosecutions; and the treatise on Washington Practice supports the conclusion that the rule applies in both criminal and civil actions.
¶ 43 ER 1101(a) states that the evidence rules apply "to all actions and proceedings" in Washington courts. Under ER 1101, the rules of evidence, including ER 408, apply in all proceedings unless some specific language limits applicability. Nothing in the language of ER 408 specifically limits its applicability to civil cases.
¶ 44 Further, the majority acknowledges that at least part of ER 408 does apply to criminal proceedings but fails to explain effectively why the remainder of the rule does not similarly apply. The rule states that it "does not require exclusion when the evidence is offered for ... proving an effort to obstruct a criminal investigation or prosecution." ER 408. There is no question this language refers to criminal acts. The fact that part of the rule applies in criminal prosecutions supports the conclusion that the remainder of the rule similarly applies. The majority claims that this reference "does create some ambiguity" and proceeds to give a historical and definitional justification of why *816 it does not apply to criminal cases. Majority at 811-13. Such analysis is unnecessary.
¶ 45 From a policy perspective, it makes sense that all of ER 408 applies to criminal cases, as well as civil proceedings. Though primarily related to civil cases, the rule also has at least limited relevance in criminal proceedings. 5A KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 408.3, at 52 (4th ed.1999). The main purpose of the rule is to encourage settlement. Regardless of how remote the possibility of criminal charges, individuals would be less inclined to settle cases if the mere act of settlement negotiations might incriminate them in some later criminal proceeding. DAVID P. LEONARD, THE NEW WIGMORE, A TREATISE ON EVIDENCE, SELECTED RULES OF LIMITED ADMISSIBILITY § 3.7.3 at 372 (2002).
¶ 46 A defendant's action will commonly constitute criminal as well as civil liability. In such a situation, ER 408 would "protect negotiations in the civil proceeding from disclosure in the criminal proceeding." 5A KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 408.3, at 52 (4th ed.1999). Further, the trend of encouraging negotiations between parties often creates a prompt settlement that is better and more satisfying for the victim than a criminal sanction later against the perpetrator. Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 138 (2d ed.2004), n. 17. The opportunity for prompt compensation should not be denied to victims of certain civil cases simply because the defendant is concerned that criminal charges might be brought against him or her later for the same offense.
¶ 47 There are few legal or policy arguments for limiting ER 408's applicability to civil cases. Applying ER 408 to criminal cases has little effect on law enforcement efforts. Only statements made through civil negotiations are inadmissible under ER 408 and do not include admissions made to third parties or law enforcement. Additionally, a person cannot hide behind this rule to keep out evidence that the defendant bribed or threatened witnesses or authorities. 5A KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 408.7, at 11 (4th ed. 2005 Supp.).
¶ 48 Ultimately, if ER 408 does not apply to criminal cases, many civil defendants would be reluctant to engage in negotiations. Under that interpretation of the rule, attorneys might be subject to a claim of malpractice if they did not discourage their clients from engaging in certain civil settlements. Such a result would be unfortunate and absurd considering the rule was expressly created to encourage civil settlements.
¶ 49 Statements made in civil settlements should be excluded from later civil and criminal proceedings, according to ER 408. As the majority states, this conclusion is supported by cases from other federal and state appellate courts. United States v. Hays, 872 F.2d 582, 589 (5th Cir.1989); United States v. Bailey, 327 F.3d 1131, 1146 (10th Cir.2003); State v. Gano, 92 Hawai'i 161, 167, 988 P.2d 1153 (1999). The application of ER 408 to all proceedings, criminal and civil, serves the exact purpose for which the rule was createdto encourage the effective negotiation of civil claims. The majority's interpretation of ER 408 is inconsistent with the intent and language of this rule. The conviction should be reversed and the case remanded back to the trial court for further proceedings.
MADSEN, SANDERS, CHAMBERS, JJ., concur.
NOTES
[1] O'Connor's mother also testified that O'Connor was home from 10:00 p.m. until at least 2:00 a.m. on that night. RP at 72-73.
[2] One commentator states that ER 408 "may have at least limited utility in criminal cases" because ER 410 does not appear to exclude plea offers made by the prosecution and ER 408 "closes this gap and protects the government's offers from disclosure at trial." 5A KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 408.3, at 52 (4th ed.1999) (citing United States v. Verdoorn, 528 F.2d 103 (8th Cir.1976)). We disagree. While some criminal offenses may involve a dispute as to amount, i.e., the value of stolen property, this language does not lend itself, and certainly not uniformly, to plea negotiations or offers.
[3] In oral argument, O'Connor's attorney argued that Bruemmer and Humphreys are simply consistent with the last clause of ER 408, which allows admission of evidence to prove "an effort to obstruct a criminal investigation or prosecution." However, the evidence of an attempt to compromise in these prerule cases was admitted in criminal trials as evidence of an admission by the defendant. For example, in Humphreys, the defendant objected to testimony about the circumstances of his offers to pay for wheat he had stolen. Humphreys, 118 Wash. at 475, 203 P. 965. The court held that the evidence was admissible because the defendant's "conduct and offer were in the nature of an admission." Id. Thus, the rationale of the prerule cases is not reflected in the last clause of ER 408 because that clause does not pertain to a defendant's admission of wrongdoing.
[4] Chapter 10.22 RCW provides that if the defendant is prosecuted for a misdemeanor and the victim also has a civil remedy, the criminal prosecution may be compromised, subject to certain exceptions including domestic violence. RCW 10.22.010-.020. If the victim shows the court that he or she has received satisfaction for the injury, the court, in its discretion, may dismiss the charges. RCW 10.22.020.
[5] Similarly, O'Connor maintains that settlements will be discouraged even in cases where there is insurance coverage for the particular claim. However, the basis of admissibility in criminal trials of offers to compromise in circumstances where criminal acts give rise to civil liability is, as noted above, that they constitute admissions. An insurance company can offer to settle a claim without that offer constituting an admission of the defendant's wrongdoing. Cf. Smith v. Wash. Ins. Guar. Ass'n, 77 Wash.App. 250, 252 n. 1, 890 P.2d 1060 (1994) (quoting an insurance settlement agreement that provided it was a good faith compromise and "`NOT an admission against the interest of any party'").
[6] O'Connor points to Darden, 145 Wash.2d at 624, 41 P.3d 1189 and State v. McDaniel, 83 Wash.App. 179, 186, 920 P.2d 1218 (1996), rather than analyze the trial court's limitation on the scope of cross-examination under ER 608. Even the Darden and McDaniel courts looked first to whether the evidence at issue was relevant. Darden, 145 Wash.2d at 624, 41 P.3d 1189 (applying the basic rules of evidence to determine whether Darden's confrontation rights were violated); McDaniel, 83 Wash.App. at 185, 920 P.2d 1218 (asking first whether the witness's prior false testimony was relevant). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. In Darden, the witness's precise vantage point was determined to be relevant and a proper subject for cross-examination where the eyewitness's testimony was crucial to the identification of the defendant. 145 Wash.2d at 624-25, 41 P.3d 1189. In McDaniel, the witness's prior false testimony under oath in the related civil proceeding was deemed relevant. 83 Wash.App. at 186, 920 P.2d 1218. As discussed in more detail in the text of this opinion, this case is distinguishable because it was reasonable for the trial court to conclude that Bologna's retention of the insurance money in this case was not relevant to the facts at issue here.
[7] While one commentator has criticized the Court of Appeals examination here as to whether evidence is germane or relevant to the case at hand, that commentary does not cite to a single Washington case to support this criticism. See 5A KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 608.7, at 76-77 (4th ed. 2005 Suppl.).
[8] Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) is distinguishable because Van Arsdall is a bias case. Id. at 676, 679, 106 S.Ct. 1431. Here, the insurance payment provided no motive for Bologna to testify the way she did at trial.