# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON, )
) No. 68219-9-I
Respondent, )
) DIVISION ONE
v. )
) UNPUBLISHED OPINION
RUBEN RUIZ-SORIA, )
)
Appellant. ) FILED: March 18, 2013

2013 MAR 18 AM 9: 24
COURT OF APPEALS DIV I
STATE OF WASHINGTON
FILED

GROSSE, J. — Errors under Evidence Rule (ER) 404(b) are harmless unless, within reasonable probabilities, the outcome of the proceedings would have been materially affected had the error not occurred. The trial court in this case properly admitted prior misconduct evidence under ER 404(b) but did not give a proper limiting instruction. We conclude, however, that the instructional error was harmless, and therefore affirm.

## FACTS

Based on allegations that Ruben Ruiz-Soria sexually assaulted his daughters A.R. and W.C., the State charged him with one count of second degree rape of a child and one count of first degree child molestation.

Before trial, the State moved to admit evidence that Ruiz-Soria had sexually assaulted the children's aunt, B.C., 15 years earlier. Over defense counsel's objections, the court admitted the evidence under both RCW 10.58.090 and ER 404(b), stating in pertinent part:

> [T]he testimony is that [B.C.] was raped approximately five times by the defendant in Mexico in the mid-1990s . . ., when she was between the age of 10 and 12.
>
> . . . .

With regard to the similarity of the prior acts, there are some substantial and I think fairly significant similarities. The contact was of a sexual nature with a young girl under the age of consent. The victim was a relative or the relative of his girlfriend at the time. He allegedly raped the girls when they were vulnerable; their mothers were away from the home. [B.C., A.R., and W.C.] were all close to the same age when the alleged misconduct occurred. And the defendant allegedly convinced all three to keep quiet about the abuse through threats of harm to Maximina.

. . . .

The appellate courts have repeatedly found that the evidence or prior sex offenses is highly probative. I believe that [B.C.'s] testimony about having been raped and then threatened with harm to Maximina is very probative. It's evidence that supports the State's allegation that the defendant is sexually attracted to young girls and that he's willing to take steps to fulfill that attraction.

The evidence though, is also very highly prejudicial to the defendant. . . .

. . . .

Given the substantial similarity of [B.C.'s] story to that told by [A.R. and W.C.] and the ability of the parties and the court to fashion an appropriate limiting instruction, the court will allow the State to offer testimony from [B.C.] that she was raped by the defendant and then threatened to induce her to keep silent about it.

. . .

Under [ER] 404(b), the biggest concern that I had about . . . the common scheme or plan exception was the fact that the incidents occurred so far apart in time. But in State v. De[V]incentis, 15[0] Wn.2d 11, [74 P.3d 119 (2003)], which is a 2003 case, the Supreme Court basically said that incidents of sexual misconduct, even if they're 15 years apart, can still be evidence of a common scheme or plan. Basically, the fact that the alleged incidents were committed in a similar way and under similar circumstances is sufficient under the De[V]incentis case to be admissible under ER 404(b).

So given the circumstances of the proffer that's been made to the court, I would independently find the evidence admissible under the common scheme or plan exception to ER 404(b).

At trial, Maximina Cortes testified that she and Ruiz-Soria have four daughters: R.R. (17 years old at trial), A.R. (15), W.C. (14), and S.C. (5). The three oldest girls were born in Mexico in the 1990s.

2

Maximina testified that her relationship with Ruiz-Soria was marred by domestic violence. He hit her frequently, often in front of the children. Her sister, B.C., witnessed several of these incidents in Mexico.

In 1997, Ruiz-Soria left the family to live in the United States. Maximina joined him in 2001, but soon went back to Mexico to retrieve their daughters. When she returned to the United States, she learned that Ruiz-Soria had been involved with another woman and had fathered two children with her. Nevertheless, Maximina and the girls moved into a Seattle apartment with him.

Maximina testified that after about six months, Ruiz-Soria began coming home from work drunk and angry. If she asked where he had been, he would beat her and tell her that it was none of her business. The children were afraid and would often ask her if she was okay.

In the fall of 2006, her daughters told her they wanted to talk to her in R.R.'s bedroom. A.R. disclosed that Ruiz-Soria had sexually assaulted her. Maximina angrily confronted him. When he denied the allegations, Maximina had A.R. repeat her allegations. Ruiz-Soria then said A.R. was telling the truth. Maximina told him to leave and took the girls to the park.

A week later, Maximina returned home from work to find Ruiz-Soria in the house. He had cooked and cleaned and said, "I already talked to my daughter, so I'm going to stay and live with you." Maximina again told him to leave. She testified that he never lived with the family again.

On July 11, 2009, the family attended a special mass for R.R.'s 15th birthday. Two days later, on July 13, Maximina, her daughters, and other

3

relatives gathered at the Rose Garden in Portland, Oregon. W.C.'s godmother told Maximina that Ruiz-Soria had done something to W.C.

In August 2009, Maximina obtained a restraining order against Ruiz-Soria and started taking A.R. and W.C. to counseling. Maximina eventually reported the incidents to the police, who took statements from A.R. and W.C in the presence of their aunt, B.C. After the officers left, B.C. started crying and disclosed that Ruiz-Soria had sexually assaulted her when she was a child in Mexico.

A.R. testified that in 2005 or 2006, when she was approximately 10 years old, Ruiz-Soria sexually assaulted her while her mother was at work. A.R. was babysitting her sister, S.C., when Ruiz-Soria came home from work. While A.R. was making his bed, Ruiz-Soria came out of the bathroom and told her to pull down her pants. He was wearing his work clothes, including black and white striped pants. A.R. was scared and took off her red pajamas and underwear. Ruiz-Soria laid her down on the carpet, took out his penis, and put it inside her. A.R. cried from the pain. When Ruiz-Soria saw her tears, he stopped. He gave her some candy and said that if she told anyone something would happen to her sisters and her mother.

A.R. said she first mentioned the incident one year later when she told R.R. She shared a room at the time with W.C. and R.R. She woke R.R. up and told her everything. The next day, R.R. told Maximina when she arrived home from work. Maximina, R.R., and A.R. then went into the living room and confronted Ruiz-Soria. A.R. recalled sitting on the couch with Maximina. Ruiz-Soria pulled up a chair and sat down. Maximina repeated A.R.'s allegations and

Ruiz-Soria denied them. A.R. said, "Why are you lying, you know you did this[.]" Ruiz-Soria said, "But she liked it." A.R. became angry and said, "No, I didn't. Why would I like it?" According to A.R., Maximina told Ruiz-Soria to get his things and leave. She then took all three girls to the park and they discussed what to do next.

Ruiz-Soria returned the next morning while Maximina was at work. He brought groceries in and asked A.R. to forgive him, which she did. When Maximina came home, "she didn't know what to do" because A.R. was asking her to let Ruiz-Soria stay. He ended up staying with them for months before going back to Mexico. He returned from Mexico after about a year but never lived with them again.

A.R. testified that at some point after Ruiz-Soria returned from Mexico, Maximina reported A.R.'s allegations to police. All her sisters and B.C. were present when the police came to their apartment.

On cross-examination and re-direct, A.R. had difficulty with dates and the sequence of events, particularly the events occurring in the summer of 2009. She said she did not learn of W.C.'s abuse until after Ruiz-Sorias left for Mexico.

Thirteen-year-old W.C. testified that Ruiz-Soria molested her when she was 8 years old. Maximina was at work and she was watching television in her parents' bedroom with her sisters and Ruiz-Soria. She left the room briefly, and when she returned her sisters were asleep. Ruiz-Soria was on the floor saying, "Come and lay down with me." W.C. lay beside him and he started rubbing her vagina over her clothing. This went on for 5 to 10 minutes before she got up and

left the room. Later, Ruiz-Soria came to her room and told her not to tell anyone or something would happen to her mother.

W.C.'s recollection of A.R.'s disclosure to Maximina mirrored A.R.'s. W.C. said she and R.R. were in the bedroom when A.R. told Maximina. When Maximina confronted Ruiz-Soria, he denied the allegations. W.C. remembered him "saying that [A.R.] wanted it to happen." Maximina told him to leave and then took the girls to the park. Ruiz-Soria continued to live with them until he went away to Mexico.

W.C. testified that in the summer of 2009, she and her sisters went to the Rose Garden in Portland, Oregon with Maximina and extended family members. W.C.'s godmother asked W.C. if Ruiz-Soria had ever done anything to her. W.C. said, "[H]e tried to do something." She testified that she was scared and not ready to tell her godmother the entire truth. Shortly after her disclosure, she began seeing a counselor. She eventually told the counselor everything and also told her story to the police.

On cross-examination, W.C. said she and A.R. discussed their abuse before A.R. disclosed to Maximina. This conflicted with A.R.'s testimony that she did not know about W.C.'s abuse until much later.

Maximina's sister, B.C., testified that Ruiz-Soria sexually assaulted her several times in Mexico when she was between 10 and 12 years old. He came by her house when her mother was working, took her to a room, removed her clothes from the waist down, and put his penis in her vagina. When he finished, he told her not to tell anyone or Maximina would "pay the consequences." B.C. interpreted this as a threat to hit Maximina because she had seen him hit and

6

kick her before. Ruiz-Soria had intercourse with B.C. six to eight times. Based on B.C.'s age, the incidents occurred sometime between 1995 and 1997. B.C. testified that she first told Maximina about the incidents in January 2011.

R.R. corroborated the testimony of her sisters regarding A.R.'s initial disclosure to R.R. and Maximina. R.R. did not learn of W.C.'s abuse until July 2009. She testified that Ruiz-Soria and Maximina argued frequently, especially when he was drinking, and that he slapped and hit her.

Seattle Police officer Kayla Cockbain testified that she and another officer took statements from A.R. and W.C. on October 5, 2010. A.R. became visibly upset during her interview. She did not "go to her [mother] for answers" when describing the incident. W.C. became "very upset and began to cry" during her interview.

Seattle Police Detective Michael Moore testified that he interviewed A.R. and W.C. on October 26, 2010. He also interviewed Maximina and B.C. by phone.

The defense called no witnesses. In closing argument, defense counsel argued that there was reasonable doubt based on a paucity of details, delayed reporting, inconsistent chronologies, and Maximina's motive to fabricate the allegations. Counsel repeatedly pointed out that allowing Ruiz-Soria to live with the family after A.R.'s disclosure was inconsistent with the allegations of abuse. Similarly, he pointed out that B.C.'s decision to live with the family in Seattle despite her claim that Ruiz-Soria repeatedly raped her when she was a child in Mexico was also incredible.

The jury convicted Ruiz-Soria as charged. He appeals.

ANALYSIS

Ruiz-Soria contends the trial court abused its discretion by admitting B.C.'s allegations of prior sexual misconduct under RCW 10.58.090 and ER 404(b). The State concedes that, under State v. Gresham,[1] the court erred in admitting the evidence under RCW 10.58.090. It argues, however, that the court properly admitted the evidence under ER 404(b). We agree with the State.

Under ER 404(b),[2] evidence of prior misconduct may be admitted to show a common scheme or plan if it is "'(1) proved by a preponderance of the evidence, (2) admitted for the purpose of proving a common plan or scheme, (3) relevant to prove an element of the crime charged or to rebut a defense, and (4) more probative than prejudicial.'"[3] Ruiz-Soria challenges the trial court's application of the second and fourth elements of this test.

As to the second element, he correctly points out that a common scheme or plan "may be established by evidence that the Defendant committed markedly similar acts of misconduct against similar victims under similar circumstances."[4] Evidence of such a plan "'must demonstrate not merely similarity in results, but such occurrence of common features that the various acts are naturally to be

---

[1] 173 Wn.2d 405, 269 P.3d 207 (2012).
[2] ER 404(b) provides:
> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
[3] State v. DeVincentis, 150 Wn.2d 11, 17, 74 P.3d 119 (2003) (quoting State v. Lough, 125 Wn.2d 847, 852, 889 P.2d 487 (1995)).
[4] Lough, 125 Wn.2d at 852.

explained as caused by a general plan of which the charged crime and the prior misconduct are the individual manifestations.'"[5]

Contrary to Ruiz-Soria's assertions, the incidents involving A.R., W.C., and B.C. share sufficient common features to support a conclusion that they were manifestations of a general scheme or plan. The girls were similar in age and were related to Ruiz-Soria. The sexual assaults occurred when the girls' mothers were at work. The acts were facilitated by Ruiz-Soria's position of trust. Finally, and most significantly, Ruiz-Soria accomplished these acts by threatening the girls in a unique manner. Instead of threatening to harm the girls if they disclosed the acts, he threatened to harm Maximina—a person the girls knew he had harmed in the past. These common features are supported by the record and are sufficient to demonstrate a common scheme or plan under ER 404(b).[6]

The trial court was also well within its discretion in concluding that the probative value of B.C.'s testimony outweighed its prejudicial effect. "Generally, courts will find that probative value is substantial in cases where there is very little proof that sexual abuse has occurred, particularly where the only other

_____

[5] DeVincentis, 150 Wn.2d at 19 (quoting Lough, 125 Wn.2d at 860).

[6] See e.g., State v. Kipp, __ Wn. App. __ , 286 P.3d 68, 72-73 (2012) (facts showed common scheme or plan where victims were of similar ages, were defendant's nieces, and were molested in his house and their grandparents' house); Gresham, 173 Wn.2d at 422–23 (evidence showed common scheme or plan where defendant took trips with young girls and fondled their genitals at night when other adults were asleep); State v. Kennealy, 151 Wn. App. 861, 889, 214 P.3d 200 (2009) (facts showed "design or pattern to gain the trust of children. . . in order to sexually molest them" where charged victims were between ages of 5 and 7 and lived in same complex, uncharged victims were nieces and daughter between ages of 7 and 13, acts with all victims occurred out of view of others, children trusted defendant because of family relation or gifts and conversation, victims were touched under and outside of their clothing on their vaginas, and sexual acts occurred more than once with most of the victims).

evidence is the testimony of the child victim."[7]  Here, the State's case rested almost entirely on the credibility of A.R. and W.C.  As the prosecutor noted in closing, "the issue in this case is really going to be about credibility.  You're going to be asked to talk about do you believe these people."  In addition, as the trial court recognized, B.C.'s testimony was necessary to rebut Ruiz-Soria's defense:

> But the defense theory of the case as I understand it, is that the children have fabricated these stories. I think the theory was . . . to help the mother in some way obtain revenge against the defendant either for having abandoned them when he went to Mexico or for some other reason relating to their relationship.
> If this is the theory being advanced, then [B.C.'s] testimony would arguably be necessary to demonstrate an existence of a sexual attraction to children that predates any alleged fabrications by these two girls.

The court did not abuse its discretion in concluding that the probative value of B.C.'s testimony outweighed any resulting prejudice.

Ruiz-Soria next contends the trial court erred in failing to give an instruction limiting the jury's use of the misconduct evidence to prove a common scheme or plan.  The State responds that Ruiz-Soria either failed to preserve or invited the error.  The State overlooks the fact that an ER 404(b) limiting instruction could not have been given at trial because the evidence was also admitted under RCW 10.58.090.  That statute allowed juries to use misconduct evidence for the very purposes disallowed by ER 404(b).[8]  Because the statute was declared unconstitutional after his trial, thus leaving ER 404(b) as the only basis for admitting the misconduct evidence, Ruiz-Soria is entitled to argue for the first time in this court that the jury should have received a proper limiting instruction.

---

[7] State v. Sexsmith, 138 Wn. App. 497, 506,157 P.3d 901 (2007).
[8] See Gresham, 173 Wn.2d at 429-30.

Ruiz-Soria correctly points out that when a court admits evidence under ER 404(b), the defendant is entitled to an instruction informing the jury of the specific purpose of the evidence and prohibiting them from using it to conclude that the defendant has a particular character and acted in conformity with that character.[9] No such instruction was given in this case. That omission was error.[10]

The remaining question is whether the error was harmless. Error of this nature is harmless unless "'within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.'"[11] We conclude, for several reasons, that there is no reasonable probability the outcome would have been different had a proper limiting instruction been given.

First, while the instruction regarding the misconduct evidence allowed the jury to use it for "any matter to which it is relevant," it also emphasized that the evidence was contextual in nature and not to be given conclusive weight:

> In a criminal case in which the defendant is accused of an offense of sexual assault or child molestation, evidence of the defendant's commission of another offense or offenses of sexual assault or child molestation is admissible and may be considered for its bearing on any matter to which it is relevant.
> **However, evidence of a prior offense on its own is not sufficient to prove the defendant guilty of the crimes charged in this case. Bear in mind as you consider this evidence at all times the State has the burden of proving that the defendant committed each of the elements of the offenses charged in**

---

[9] Gresham, 173 Wn.2d at 423–24; see State v. Griswold, 98 Wn. App. 817, 825, 991 P.2d 657 (2000) ("[T]he court should give limiting instructions to direct the jury to disregard the propensity aspect of the evidence and focus solely on its evidentiary effect tending to show common scheme or plan.").

[10] Gresham, 173 Wn.2d at 424-25.

[11] Gresham, 173 Wn.2d at 433 (quoting State v. Smith, 106 Wn.2d 772, 780, 725 P.2d 951 (1986)).

**this case**. I remind you that the defendant is not on trial for any act, conduct, or offense not charged in this case.[12]

Second, both defense counsel and the prosecutor told the jury that the evidence had a limited purpose. Defense counsel stated:

> I mean, the idea is that he's not on trial for what he did to [B.C.]. The State is saying look at this, **you need to use it to evaluate the credibility of what [A.R.] and [W.C.] are saying** . . . .
>     **The idea is that we have to instruct you regarding this because the danger is well, a rapist in 1996 who gets [B.C.] must be a rapist in 2006 against some child, is to try and make sure you don't make that connection.**[13]

Similarly, the prosecutor argued that B.C.'s testimony "shows that this man **has a pattern and an approach to children of that age** and what he wants to do with them."[14] Thus, both counsel indicated that the evidence was admitted to show a common scheme or plan.[15] In addition, the prosecutor barely mentioned the misconduct evidence and never encouraged the jury to use it for propensity.[16]

Third, the victims' testimony regarding the incidents and disclosures was detailed, relatively consistent, and largely corroborated by their older sister R.R., who was not herself a victim.

---

[12] (Emphasis added.)

[13] (Emphasis added.)

[14] (Emphasis added). Contrary to Ruiz-Soria's assertions, the prosecutor's statement later in closing argument that the misconduct evidence was "about . . . understanding that the defendant likes young girls" was not a propensity argument. Viewed in the context of the prosecutor's earlier argument quoted above, this argument was simply referring to his common scheme or plan.

[15] State v. Williams, 156 Wn. App. 482, 492, 234 P.3d 1174, 1178 (2010) ("[T]he prosecutor effectively gave the jury a limiting instruction during closing argument" by telling them they could not consider prior convictions for propensity and could only consider it for "a common scheme or plan.").

[16] City of Seattle v. Patu, 108 Wn. App. 364, 377, 30 P.3d 522 (2001) (noting that City "did not argue that the conviction made it more likely that Patu was a bad person or that he had a propensity to obstruct the police").

Fourth, there is some merit to the State's observation on appeal that while the use of misconduct evidence to show a common scheme or plan is proper and the use of the same evidence for propensity is improper, the two uses are similar. Misconduct evidence cannot be used to show propensity, i.e., to show that the defendant has a certain character and acted in conformity with that character. State v. Gresham, 173 Wn.2d at 423-24. But such evidence *can* be used to show that the defendant's conduct in the current case conformed with the conduct alleged in the prior allegation. State v. Gresham, 173 Wn.2d at 424. As the prosecutor notes on appeal:

> It is a fine line indeed, and a difficult one to distinguish, between a jury being able to find that the defendant's character as a child rapist (evidenced by his rape of B.C.) showed he raped [A.R. and W.C.], and that the defendant's rape of B.C. showed he had a common scheme or plan to rape [A.R. and W.C.]. In other words, in a case like this, the proper use of the evidence for [ER] 404(b) purposes, and the improper use of the evidence, is almost indistinguishable.

Considering the subtlety of this distinction, it is highly unlikely that a proper limiting instruction would have affected the jury's verdict.

Finally, given the evidence presented, the defense theory that Maximina orchestrated the allegations strained credulity. As the prosecutor noted:

> This plan, for which there is no evidence, . . . doesn't make any sense. . . . [H]ow did it come out? It didn't come out through mom; it came out through [R.R.] Why get her involved if she's not involved in the conspiracy? That would mean that mom would have to get [A.R.] -- listen, [A.R.], I want you to tell [R.R.] about your dad having sex with you. Tell [R.R.] and [R.R.] obviously will tell me and then I can confront him. But when we confront him, I'll kick him out and then let him back in, then I'll sit on it two years, and then two years from now, [W.C.], she'll come up and say something too. And then, you know, we'll really go after him. And then we'll call the police like four or five months after that. Please.

13

Considering the evidence, instructions, and arguments in this case, there is no reasonable probability that the outcome would have been different absent the error.

Affirmed.

WE CONCUR: