# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| TERESA HARBOTTLE, individually and as Personal Representative of the Estate of JOHN F. HARBOTTLE III, deceased, | No. 51427-3-II |
| Appellant, | |
| v. | |
| KEVIN E. BRAUN, M.D. and JANE DOE BRAUN, and their marital community, | PUBLISHED OPINION |
| Respondents. | |

MELNICK, P.J. — John Harbottle, III became Dr. Kevin Braun's patient.  After Harbottle passed away, his wife, individually and on behalf of his estate (collectively Estate) filed a lawsuit for medical negligence and failure to obtain informed consent.  The trial court granted summary judgment to Braun on the informed consent claim.  The medical negligence claim went to trial and a jury found for Braun.  The Estate appeals the summary judgment order and the trial court's exclusion of Braun's prior misconduct from evidence at trial.

The Estate did not have a claim for failure to obtain informed consent because Braun failed to diagnose Harbottle's condition and did not know about it. When a doctor misdiagnoses a patient's condition, and therefore is unaware of an appropriate treatment, a claim for failure to obtain informed consent does not arise.  In addition, the trial court did not abuse its discretion by excluding the prior misconduct evidence.  We affirm.

FACTS

I.    TREATMENT

John Harbottle first became Braun's medical patient in January 2010. In June 2011, Harbottle complained to Braun of "chest burning" he had been experiencing for about two months. Clerk's Papers (CP) at 263. At first, Braun believed numerous potential causes for the chest burning existed, including gastrointestinal and cardiovascular. Braun performed a physical examination and determined the cause was likely gastroesophageal reflux disorder (GERD).[1]

Braun ordered a number of tests for Harbottle, including an electrocardiogram (EKG), a chest x-ray, and a stress test. Braun's nurse performed the EKG on the same day as the appointment. Braun and a cardiologist reviewed the EKG and stated it did not suggest any problems with his cardiovascular system. Another doctor stated the EKG signaled the need for a stress test, but agreed the EKG alone was not a reason to get a stress test. The x-ray came back as normal. Braun referred Harbottle to a cardiologist to perform a stress test, which would determine if the source of Harbottle's pain involved cardiovascular issues.

Braun prescribed a GERD medication. Braun and Harbottle scheduled a follow-up visit for July to see whether the GERD medication resolved Harbottle's symptoms and to review the results of the diagnostic tests.

At the July follow-up appointment, Harbottle reported that his symptoms had resolved. Braun felt he had identified the cause of the chest pain as GERD. The GERD medication would not have prevented coronary artery disease symptoms other than via placebo effect. Braun did not believe a cardiovascular cause of the pain was "ruled out," but thought it was unlikely because the

---

[1] GERD "is when acidic stomach contents come up into the esophagus, where they don't belong, and they cause symptoms." CP at 37.

symptoms had resolved. CP at 266. Braun did not follow up with Harbottle regarding the stress test, as he believed the issue had been resolved through GERD treatment.

In August, Harbottle saw Braun for unrelated issues. He noted that Harbottle's heartburn was well treated by GERD medication. A physical examination showed no abnormalities. Neither Braun nor Harbottle mentioned the stress test. A cardiologist later stated that Braun should have treated Harbottle for elevated lipids and cholesterol at this visit.

At some point, Harbottle cancelled the stress test believing that Braun had "pinpointed" the problem. CP at 267. Braun did not tell Harbottle to cancel the test and did not know why he did so. If Harbottle had followed through with the stress test, the test would likely have been positive for coronary artery disease. Braun stated, with regard to the stress test, "I engaged in shared decision-making with Mr. Harbottle, with regard to his options for additional testing. At the time he elected a stress test, and it was ordered, and the referral was completed, to the best of my ability." CP at 274.

In March 2012, Harbottle complained to Braun of shortness of breath caused by exertion. After reviewing Harbottle's symptoms, Braun prescribed him medication for asthma. Braun did not believe the issues related to Harbottle's cardiovascular system because Harbottle specifically denied experiencing chest pain. Braun did not see Harbottle again.

The following May, Harbottle died of cardiac arrest at the age of 53. An autopsy report noted his cause of death as atherosclerotic heart disease.

II.  LAWSUIT

In January 2015, the Estate filed a complaint against Braun alleging medical negligence and failure to obtain informed consent, both of which proximately caused Harbottle's death. Braun moved for summary judgment on the informed consent claim, arguing that failure to diagnose a

3

condition is a matter of medical negligence but not informed consent. The trial court granted Braun's motion, concluding that no genuine issue of material fact existed.

A. EXPERT TESTIMONY

Dr. Jerrold Glassman, a cardiologist, testified in a deposition that every male patient with chest pressure consistent with heart disease should be referred to a cardiologist for a stress test. Glassman and Dr. Howard Miller, another expert witness, believed that Harbottle suffered from two heart disease risk factors: he was a male and he had a history of elevated lipids. Glassman said that referral to a cardiologist for a stress test would have been appropriate, despite the results of the tests Braun performed and the resolution of his symptoms via the GERD medication. Glassman also stated he believed the failure to refer Harbottle to a cardiologist led to his death. Miller stated Braun should have followed up with the stress test to rule out coronary artery disease, even though the GERD medication resolved Harbottle's symptoms. Miller stated that the standard of care should have required Braun to "rule out" coronary artery disease with a stress test. CP at 330.

Relating to the diagnostic process generally, Braun said, "I'm not sure ruling out is ever what we do. What we do is risk stratify and try and do a responsible history, physical examination, data gathering, like labs and EKG, and subsequent risk stratification as to how high a risk you have rather than ruling out." CP at 274. Throughout his deposition, Braun used terminology reflecting relative likelihood that Braun suffered from various conditions. While he refused to say he felt a cardiac cause was "ruled out," he stated that after the GERD medication resolved Harbottle's symptoms, that "what had been a very unlikely potential cause of his symptoms was even less likely, given that his symptoms had completely resolved." CP at 266.

B.       EVIDENCE EXCLUDED

During discovery, the Estate submitted an interrogatory asking whether Braun had "ever been the subject an [sic] allegation, claim, complaint, or lawsuit (including any civil claims, criminal claims, and/or professional complaints) alleging inappropriate conduct or improper and/or negligent or substandard treatment." CP at 716. Braun responded, "[o]ther than this case, no." CP at 716.

At Braun's subsequent deposition, the Estate asked why he had left his job at a clinic in 2005. Braun said he left to practice on his own and for more direct control over his care and stated that his departure was "favorable." CP at 275. He said he would "have to speculate" whether the clinic would know of additional reasons for his departure. CP at 275-76. Braun listed reasons he wanted to leave the clinic, including complaints about the clinic staff "among other things." CP at 276. When asked whether he was subject to complaints during his time at the clinic, Braun said "[t]here's always complaints" such as by patients who didn't receive prescriptions they wanted. CP at 276. When asked about other complaints, Braun said he would "have to go back and look through" but did not know what he would look through. CP at 276. Braun maintained that his departure from the clinic had been mutual.

The Estate subpoenaed Braun's employment file and various other documents relating to his employment at the clinic, including "any and all complaints, grievances, or investigations, and the like pertaining" to Braun. CP at 590-91. Records produced by the clinic indicated that three female patients had complained of inappropriate flirtatious behavior and untoward touching. The clinic placed Braun on administrative leave as a result of the complaints and considered terminating his employment. Braun resigned five days later.

5

The Medical Quality Assurance Commission (MQAC) conducted an investigation and described the allegations of misconduct in detail. The MQAC case summary described three incidents between 2003 and 2005 in which Braun allegedly inappropriately touched and made sexual innuendo comments to female patients. Braun denied any wrongdoing. The MQAC dismissed the complaints and closed the file based on insufficient evidence. It determined no disciplinary action was necessary.

Braun moved to exclude evidence of past grievances filed against him, arguing they were irrelevant, overly prejudicial under ER 403, and not germane to his treatment of Harbottle. The Estate responded that Braun's professional misconduct and untrustworthiness during discovery were "highly relevant to his veracity" at trial. CP at 820.

At arguments on the motion to exclude, the trial court stated that "[t]here would never, in this case, be a reveal to the jury as to what the underlying issues were, sexual misconduct, there'd be no way that I would allow that in," as it would be "way too prejudicial." Report of Proceedings (RP) (Sept. 8, 2017) at 26. The Estate's attorney agreed. The court said it was concerned that the facts of the underlying misconduct were "so prejudicial that [it was] concerned about whether it takes over the case as opposed to what needs to be the issue, which is did he violate the standard of care." RP (Sept. 8, 2017) at 27-28. The parties primarily argued about whether the Estate could impeach Braun's credibility with his dishonest discovery responses. The court granted Braun's motion to exclude.

After a trial, the jury returned a verdict for Braun on the medical negligence claim and the trial court entered judgment for Braun. The Estate appeals, arguing the court erred by granting summary judgment on the informed consent claim and excluding evidence of Braun's prior instances of misconduct.

6

ANALYSIS

I.     INFORMED CONSENT

The Estate contends that the trial court erred by granting summary judgment for Braun on the Estate's informed consent claim. It claims that "where the physician knows of the condition but misdiagnoses it believing another condition is present, the physician must advise the patient of the possible conditions known to him or her and inform the patient of them so that the patient can make an informed decision." Br. of Appellant at 21. The Estate acknowledges that "a physician cannot advise of a condition he/she does not know," but contends that Braun was aware that Harbottle's "symptoms of severe chest pain and shortness of breath on exertion could evidence a life-threatening coronary disease." Br. of Appellant at 21. Because the facts of this case do not support an informed consent claim, we conclude the trial court did not err in granting summary judgment.

A.     LEGAL PRINCIPLES

We review a grant of summary judgment de novo, performing the same inquiry as the trial court. *Volk v. DeMeerleer*, 187 Wn.2d 241, 254, 386 P.3d 254 (2016). "Summary judgment is appropriate when there is 'no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.'" *Volk*, 187 Wn.2d at 254 (quoting CR 56(c)). We construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *Scrivener v. Clark Coll.*, 181 Wn.2d 439, 444, 334 P.3d 541 (2014).

The doctrine of informed consent refers to the requirement that a health care provider has a duty to his or her patient "to disclose relevant facts about the patient's condition and the proposed course of treatment so that the patient may exercise the right to make an informed health care decision." *Stewart-Graves v. Vaughn*, 162 Wn.2d 115, 122, 170 P.3d 1151 (2007). "Informed

7

consent focuses on the patient's right to know his bodily condition and to decide what should be done." *Burnet v. Spokane Ambulance*, 54 Wn. App. 162, 168, 772 P.2d 1027 (1989).

"Informed consent and medical negligence are distinct claims that apply in different situations. While there is some overlap, they are two different theories of recovery with independent rationales." *Anaya Gomez v. Sauerwein*, 180 Wn.2d 610, 617, 331 P.3d 19 (2014). To prove medical negligence, a plaintiff must show that the defendant proximately caused injuries by failing to exercise the appropriate degree of care, skill, and learning. RCW 7.70.040. To prove failure to obtain informed consent, a plaintiff must prove the following four elements:

(a) That the health care provider failed to inform the patient of a material fact or facts relating to the treatment;
(b) That the patient consented to the treatment without being aware of or fully informed of such material fact or facts;
(c) That a reasonably prudent patient under similar circumstances would not have consented to the treatment if informed of such material fact or facts;
(d) That the treatment in question proximately caused injury to the patient.

RCW 7.70.050(1).

Informed consent "'does not place upon the physician a duty to explain all possible risks, but only those of a serious nature.'" *Backlund v. Univ. of Wash.*, 137 Wn.2d 651, 662 n.3, 975 P.2d 950 (1999) (quoting *Brown v. Dahl*, 41 Wn. App. 565, 570, 705 P.2d 781 (1985)). If the "'*reasonable person* in the patient's position would attach significance to a risk in deciding treatment,'" the doctor must disclose that risk as material. *Backlund*, 137 Wn.2d at 662 n.3 (quoting *Brown*, 41 Wn. App. at 570).

B.    MISDIAGNOSIS

The duty to obtain informed consent "is not confined to the choice of treatment once a disease is present and has been conclusively diagnosed." *Gates v. Jensen*, 92 Wn.2d 246, 250, 595 P.2d 919 (1979). In certain circumstances, "the right to informed consent can include the process

of diagnosis." *Anaya Gomez*, 180 Wn.2d at 617. The fact that a patient's "symptoms were 'inconclusive' . . . does not prevent the doctrine of informed consent from applying. It merely points out the duty to inform the patient of potentially fatal causes of his abnormality, and the means of ruling out or confirming this source of illness." *Keogen v. Holy Family Hosp.*, 95 Wn.2d 306, 315, 622 P.2d 1246 (1980).

However, a "physician who misdiagnoses the patient's condition, and is therefore unaware of an appropriate category of treatments or treatment alternatives, . . . may not be subject to an action based on failure to secure informed consent." *Backlund*, 137 Wn.2d at 661. "Simply put, a health care provider who believes the patient does not have a particular disease cannot be expected to inform the patient about the unknown disease or possible treatments for it." *Anaya Gomez*, 180 Wn.2d at 618. "In such situations, a negligence claim for medical malpractice will provide the patient compensation if the provider failed to adhere to the standard of care in misdiagnosing or failing to diagnose the patient's condition." *Anaya Gomez*, 180 Wn.2d at 618. This rule is necessary "to avoid imposing double liability on the provider for the same alleged misconduct." *Anaya Gomez*, 180 Wn.2d at 618.

*Gates* established that the duty of a physician to obtain informed consent applies at the diagnostic stage. 92 Wn.2d at 250-51. In *Gates*, the patient had a condition "which doubled her risk of glaucoma." 92 Wn.2d at 247. She consulted with an ophthalmologist who performed tests that put her "in the borderline area for glaucoma." *Gates*, 92 Wn.2d at 247. An additional test indicated "no evidence of abnormality," so the doctor told the patient he had checked and "found everything all right." *Gates*, 92 Wn.2d at 247-48. He diagnosed her problems as "difficulties with [her] contact lenses" and treated her accordingly. *Gates*, 92 Wn.2d at 248. The ophthalmologist did not inform the patient of her increased risk factors for glaucoma, nor that there existed "two

additional diagnostic tests for glaucoma which [were] simple, inexpensive, and risk free." *Gates*, 92 Wn.2d at 248.

The court ruled that "[t]he patient's right to know is not confined to the choice of treatment once a disease is present and has been conclusively diagnosed" because important treatment decisions are often required in "non-treatment situations" such as "procedures leading to a diagnosis." *Gates*, 92 Wn.2d at 250-51. These decisions "must all be taken with the full knowledge and participation of the patient" and the physician has a duty "to tell the patient what he or she needs to know in order to make them." *Gates*, 92 Wn.2d at 251.

*Anaya Gomez* further clarified and narrowed *Gates*. In *Anaya Gomez*, a blood test preliminarily determined that the patient's blood cultures were positive for yeast. 180 Wn.2d at 614. Because of the potential seriousness of this result, the doctor determined that if the patient was feeling ill, she should come in immediately for treatment, but, if she was feeling better, it was more likely that the test result was a false positive, "a common occurrence in microbiology labs." *Anaya Gomez*, 180 Wn.2d at 614.

After learning that the patient was feeling better, the doctor concluded the result had been a false positive and never informed her about it. *Anaya Gomez*, 180 Wn.2d at 614. The result was not a false positive and the patient died several months later as a result. *Anaya Gomez*, 180 Wn.2d at 614-15. Her estate sued the doctor and clinic for both medical negligence and failing to obtain informed consent. *Anaya Gomez*, 180 Wn.2d at 615.

"[W]hen a health care provider rules out a particular diagnosis based on the circumstances surrounding a patient's condition, including the patient's own reports, there is no duty to inform the patient on treatment options pertaining to a ruled out diagnosis." *Anaya Gomez*, 180 Wn.2d at 623. "To hold otherwise would require health care providers and patients to spend hours going

10

through useless information that will not assist in treating the patient." *Anaya Gomez*, 180 Wn.2d at 623. In a footnote, the court quoted *Keogan*, 95 Wn.2d at 331 (J. Hicks concurring in part and dissenting in part), "'[There are] 200 different things that might cause chest pain, only 3 of which are related to the heart.' A health care provider cannot possibly inform a patient about every disease that might be causing each of his or her symptoms." *Anaya Gomez*, 180 Wn.2d at 623 n.8.

The court declined to adopt a new rule requiring health care providers "to inform patients of all positive test results," noting that health care providers use many tools to form a diagnosis and "[o]nly after the provider has used these tools to make a diagnosis can he or she inform the patient about possible treatments and the risks associated with each." *Anaya Gomez*, 180 Wn.2d at 619-20. It noted that "[g]iven the vast number of false positive test results that occur in Washington on a daily basis, imposing a duty on health care providers to inform every patient about every test result would be unduly burdensome, pointless, and unwise." *Anaya Gomez*, 180 Wn.2d at 627.

*Anaya Gomez* clarified that *Gates* "has not been overruled" and that "[u]nder *Gates*, there may be instances where the duty to inform arises during the diagnostic process." 180 Wn.2d at 623. The "determining factor is whether the process of diagnosis presents an informed decision for the patient to make about his or her care." *Anaya Gomez*, 180 Wn.2d at 623.

The court distinguished *Gates* on the grounds that the doctor in *Gates* "had available 'two additional diagnostic tests for glaucoma which are simple, inexpensive, and risk free'" and that the doctor "could have put to Mrs. Gates [the decision of] whether to do the additional testing in light of her borderline test result." *Anaya Gomez*, 180 Wn.2d at 621 (quoting *Gates*, 92 Wn.2d at 248). The doctor in *Gates* also saw that the patient had "consistently high eye pressure readings that pointed to higher risk for glaucoma over a *two year* period," whereas the doctor in *Anaya Gomez*'s

11

only contact with the decedent was "a phoned-in lab report and her medical record." *Anaya Gomez*, 180 Wn.2d at 621. The doctor in *Anaya Gomez* "[u]s[ed] the information available to him," lacked "the ability to obtain more information," and "determined that there was nothing further to diagnose." 180 Wn.2d at 622.

In *Backlund*, a prematurely born child suffered from jaundice. 137 Wn.2d at 654. The doctor treated the child with phototherapy, a common remedy for that condition, but did not discuss the possibility of a riskier transfusion treatment often used in more severe cases. *Backlund*, 137 Wn.2d at 655. He did not believe the child's condition was serious enough to warrant the transfusion treatment and thought that bringing it up would cause unnecessary stress and distress to the family. *Backlund*, 137 Wn.2d at 656. The risk of brain damage from phototherapy was approximately one in 10,000, while the risk of serious consequences associated with the transfusion were about four or five in 100. *Backlund*, 137 Wn.2d at 656. The phototherapy resulted in permanent brain damage to the child. *Backlund*, 137 Wn.2d at 655. The parents sued for medical negligence and failure to obtain informed consent. *Backlund*, 137 Wn.2d at 655.

*Backlund* observed that, while the doctor was aware of the child's condition,

A physician who misdiagnoses the patient's condition, and is therefore unaware of an appropriate category of treatments or treatment alternatives, may properly be subject to a negligence action where such misdiagnosis breaches the standard of care, but may not be subject to an action based on failure to secure informed consent.

137 Wn.2d at 661. Physicians should not be liable under RCW 7.70.050 "for a condition unknown to the physician," rather such misdiagnoses are a proper basis for liability in negligence if they breach the standard of care. *Backlund*, 137 Wn.2d at 661 n.2. For example, "a physician who misdiagnosed a headache as a transitory problem and failed to detect a brain tumor may be guilty of negligence for the misdiagnosis," but it would be "anomalous to hold the physician culpable

under RCW 7.70.050 for failing to secure the patient's informed consent for treatment for the undetected tumor." *Backlund*, 137 Wn.2d at 661 n.2. An informed consent claim was available in *Backlund* because "a trier of fact might still have found [the doctor] did not sufficiently inform the patient of risks and alternatives" given that he was aware of the transfusion alternative. 137 Wn.2d at 662.

In *Flyte v. Summit View Clinic*, a pregnant woman felt ill and visited a clinic. 183 Wn. App. 559, 562, 333 P.3d 566 (2014). In the months preceding her visit, the clinic received public health alerts about "a global pandemic of 'swine flu,' a potentially fatal illness." *Flyte*, 183 Wn. App. at 562-63. The clinic neither informed the woman of the dangers of swine flu, nor about an available treatment. *Flyte*, 183 Wn. App. at 563. Her condition deteriorated and she died shortly after delivering her child, who died months later. *Flyte*, 183 Wn. App. at 563. Her estate sued the clinic for medical negligence and failure to obtain informed consent. *Flyte*, 183 Wn. App. at 562.

On the informed consent claim, the trial court instructed the jury that "[a] physician has no duty to disclose treatments for a condition that may indicate a risk to the patient's health until the physician diagnoses that condition." *Flyte*, 183 Wn. App. at 572.

On appeal, we ruled that the jury instruction was a "clear misstatement of the law" because "'[e]ven if a doctor has not specifically diagnosed a medical problem, if the doctor embarks on a diagnostic procedure which entails a reasonable foreseeable risk to the patient, the patient must be informed of the risk and possible alternatives.'" *Flyte*, 183 Wn. App. at 578 (quoting *Keogan v. Holy Family Hosp.*, 22 Wn. App. 366, 369-70, 589 P.2d 310 (1979), *rev'd by Keogan*, 95 Wn.2d 306 (emphasis omitted)). The "jury could reasonably have concluded that, in light of [the patient's] symptoms, a reasonable person in [her] position would, in making [her] decision, have attached significance to information regarding the extreme danger [swine flu] posed to pregnant

13

women and the availability of suitable prophylactic measures." *Flyte*, 183 Wn. App. at 578-79. Accordingly, the patient had an informed consent claim against the clinic and the court reversed the trial court for giving an erroneous jury instruction that contained a clear misstatement of law. *Flyte*, 183 Wn. App. at 580.

*Flyte* distinguished *Anaya Gomez* on its facts. 183 Wn. App. at 576-77. It observed that, though the doctor testified that he had "ruled out influenza," he said he "had no independent memory" of meeting the patient and "admitted that he based his testimony entirely" on his notes. *Flyte*, 183 Wn. App. at 579. The notes did not "definitively rule[] out influenza as a possible diagnosis" because they used the terms "'working diagnosis,'" with notation of "[c]hills and sweats[;] not sure where coming [sic] from[;] exam normal[.] If gets worse to go to ER," providing space for a "reasonable inference" that upper respiratory infection was only a tentative diagnosis. *Flyte*, 183 Wn. App. at 579. A witness present also testified that he recalled the doctor saying the patient had "influenza." *Flyte*, 183 Wn. App. at 579. This situation provided an issue of fact for the jury as to whether the doctor had actually ruled out influenza, and if the jury found he had not done so, it could have properly considered the informed consent claim. *Flyte*, 183 Wn. App. at 580.

In the present case, Harbottle went to Braun complaining of "chest burning." CP at 36-37. Braun ordered an EKG, a chest x-ray, and a stress test "to try and help diagnose potential causes" of the chest pain. CP at 38. He did not find the x-ray or EKG results remarkable. Braun believed the problem was most likely GERD and prescribed GERD medication. A month later, resolution of Harbottle's symptoms reinforced Braun's belief that GERD had been causing the chest pain. Braun thought a cardiac cause of Harbottle's symptoms was very unlikely and even more unlikely after his symptoms were resolved by GERD medication. Harbottle cancelled the stress test on his

own, without consulting with Braun, and told the cardiologist his doctor had "pinpointed" the cause of his symptoms. CP at 267. Braun never followed up about the stress test or informed Harbottle of potential risks if the chest pain was related to cardiovascular problems. Harbottle died of a condition that the stress test would likely have uncovered.

This case is factually similar to *Anaya Gomez*, where the doctor was aware of a test result, but believed it to be a false positive and did not inform the patient of it. In this case, Braun was aware both that chest pain was a symptom of potentially fatal coronary disease and that Harbottle suffered from chest pain, but he believed the source of Harbottle's chest pain was GERD. Harbottle's condition improved as a result of taking the GERD medication. As *Anaya Gomez* stated,

> Simply put, a health care provider who believes the patient does not have a particular disease cannot be expected to inform the patient about the unknown disease or possible treatments for it. In such situations, a negligence claim for medical malpractice will provide the patient compensation if the provider failed to adhere to the standard of care in misdiagnosing or failing to diagnose the patient's condition.

180 Wn.2d at 618.

The patient in *Gates* had consistently high eye pressure readings pointing to glaucoma risk over two years and that additional diagnostic tests for glaucoma were "simple, inexpensive, and risk free." 92 Wn.2d at 248. Harbottle lacked many risk factors for coronary disease[2] and lived a healthy lifestyle. Unlike the additional glaucoma tests available in *Gates*, the stress test in this case had to be scheduled in advance with a specialist. Braun "use[ed] the information available to

---

[2] The record reflects that major risk factors for coronary artery disease include hyperlipidemia, diabetes, smoking, hypertension, male gender, and family history. Male gender and high lipid count were the only two of these factors present in Harbottle. To the extent the parties dispute Harbottle's risk factors for coronary disease, we take the facts in the light most favorable to the Estate.

him" and "determined that there was nothing further to diagnose." *Anaya Gomez*, 180 Wn.2d at 622. *Anaya Gomez* also noted that the doctor knew the patient had "one blood test that was inconsistent with her physical condition and other tests, rendering the positive blood test more likely to be a false positive" and never knew of the specific, particularly threatening strand of yeast that turned out to be present. 180 Wn.2d at 621 n.5. Braun's assessment of Harbottle's condition over time made him believe more firmly that he suffered from GERD and not coronary disease.

The Estate contends that Harbottle's heart condition was "known" to Braun such that the case law regarding unknown conditions does not apply. Reply Br. of Appellant at 3. In support of this contention, the Estate points out that Braun "determined that Harbottle needed to see a cardiologist, then dropped that course of treatment after Harbottle responded to heartburn medication without informing him of the risks involved." Reply Br. of Appellant at 4. The record does not reflect that Braun ever knew of Harbottle's condition. Rather, he sought to diagnose Harbottle's complaints of "chest burning" and scheduled a stress test. After he believed that he successfully diagnosed the chest burning as GERD, he did not follow up further relating to the stress test. To the extent it was negligent for him to misdiagnose Harbottle's heart condition as GERD, the jury found in Braun's favor at trial.

*Flyte* distinguished *Anaya Gomez* on grounds that the doctor did not "definitively rule[] out influenza" because his chart referred to his diagnosis as "working," included influenza symptoms and that he was "not sure" where the patient's symptoms were coming from, and a witness overheard him say she had "influenza." 183 Wn. App. at 579.

Like *Flyte*, Braun in this case specifically stated he didn't "rule out" a cardiovascular cause of Harbottle's chest pain because he did not believe that was his role as a doctor. Rather, he believed a coronary disease to be an "unlikely cause" of Harbottle's pain made even more unlikely

16

by the fact that the GERD medication cleared Harbottle's symptoms. No additional evidence, such as the chart or witness present in *Flyte*, suggests that Braun ever believed Harbottle suffered from coronary disease other than Braun scheduling the diagnostic stress test. Additionally distinguishing *Flyte*, that case concerned a public health alert about which the doctor failed to warn the patient. Prophylactic treatment was available to treat swine flu before any test was able to diagnose the disease. Such extraordinary circumstances did not exist in this case.

The record in this case reflects that Braun did not know of Harbottle's coronary condition when he scheduled the stress test. Though he did not definitively "rule out," coronary disease during his diagnostic process, to do so is not the role of a doctor. Imposing a requirement that a doctor must obtain informed consent *not* to treat any condition that is not definitively "ruled out" would "require health care providers and patients to spend hours going through useless information that will not assist in treating the patient." *Anaya Gomez*, 180 Wn.2d at 623. As Braun described, when GERD medication resolved Harbottle's symptoms, "what had been a very unlikely potential cause of his symptoms was even less likely." CP at 266. Braun's misdiagnosis of Harbottle allowed for a medical negligence cause of action, for which the jury ruled in favor of Braun. On the facts of this, Braun's failure to inform Harbottle of the potential risks of coronary disease or of cancelling the stress test did not breach the duty to obtain informed consent.[3]

---

[3] Braun further contends that summary judgment was appropriate because the Estate failed to make out the prima facie elements of an informed consent case. Because we affirm on the same ground as the trial court, we do not reach this alternative argument.

II.   PRIOR MISCONDUCT

The Estate contends that the trial court erred by "refusing to address" Braun's "willful nondisclosure in discovery of past instances of professional misconduct."[4]  Br. of Appellant at 22 (initial capitalization omitted).  It claims that the trial court should have allowed evidence of Braun's past professional grievances at trial[5] and his attempts to hide those grievances in discovery to impeach Braun's credibility as a witness.  The trial court did not abuse its discretion.

"This court reviews a trial court's evidentiary decisions for an abuse of discretion.  *Farah v. Hertz Transporting, Inc.*, 196 Wn. App. 171, 181, 383 P.3d 552 (2016).  "A trial court abuses its discretion when it exercises it on untenable grounds or for untenable reasons."  *Farah*, 196 Wn. App. at 181.

ER 607 provides that the "credibility of a witness may be attacked by any party."  Parties may impeach a witness's credibility with "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility."  ER 608(b).  Such specific instances "may *not* be proved by extrinsic evidence, but may '*in the discretion of the court, if probative of truthfulness or untruthfulness*, be inquired into on cross examination of the witness . . . concerning

---

[4] The Estate contends that Braun violated discovery rules and perjured himself in his discovery responses and that such conduct is sanctionable.  It does not request sanctions or any action from this court other than reversal of the trial court's decision to exclude evidence of the misconduct.

[5] Although the Estate argues that evidence of both the underlying sexual misconduct and Braun's attempts to cover it up in discovery should have been admissible at trial, its only arguments that this evidence was relevant concern impeachment of Braun's credibility as a witness.  The Estate has not explained how the underlying sexual misconduct would have been relevant at trial for any reason since it has nothing to do with Braun's veracity.  *See* ER 608(b).  The trial court noted at oral argument on the motion to exclude that "[t]here would never, in this case, be a reveal to the jury as to what the underlying issues were, sexual misconduct, there'd be no way that I would allow that in . . . That's way too prejudicial."  RP (9/8/17) at 26.  The Estate's lawyer agreed with this assessment.  We limit our ER 608 analysis to whether the trial court should have permitted the Estate to cross-examine Braun about his dishonest discovery responses.

the witness' character for truthfulness or untruthfulness.'" *State v. O'Connor*, 155 Wn.2d 335, 349, 119 P.3d 806 (2005) (quoting ER 608(b)). The trial court has "broad discretion to admit or exclude" specific instances of nonconvicted conduct. *Loeffelholz v. Citizens for Leaders with Ethics & Accountability Now*, 119 Wn. App. 665, 708, 82 P.3d 1199 (2004).

Impeachable instances of misconduct under ER 608 "must be probative of truthfulness and not remote in time; further, the court should apply the overriding protection of ER 403 (excluding evidence if its probative value is outweighed by danger of unfair prejudice, confusion of the issues, or misleading the jury)." *State v. Wilson*, 60 Wn. App. 887, 893, 808 P.2d 754 (1991). "Any fact which goes to the trustworthiness of [a] witness may be elicited if it is germane to the issue." *State v. York*, 28 Wn. App. 33, 36, 621 P.2d 784 (1980). However, requiring the trial court to "admit *any* instance of a key witness's prior misconduct . . . would be clearly contrary to ER 608, which grants trial courts discretion to make such determinations." *O'Connor*, 155 Wn.2d at 350.

In *York*, the State's case against a defendant for delivery of a controlled substance rested largely on the testimony of an undercover investigator with the sheriff's department. 28 Wn. App. at 34. The trial court admitted evidence of the deputy's background and military service, including his experience in undercover work, but denied the defendant's request to cross-examine him about his being fired from a Montana sheriff's department over "irregularities in his paperwork procedures, and his general unsuitability for the job." *York*, 28 Wn. App. at 34.

Despite the discretion due to the trial court's decision, the appellate court reversed. *York*, 28 Wn. App. at 38. It emphasized that allowing criminal defendants "no cross-examination into an important area is an abuse of discretion" and noted that criminal defendants are "given extra latitude in cross-examination to show motive or credibility, especially when the particular prosecution witness is essential to the state's case." *York*, 28 Wn. App. at 36.

In *State v. Griswold*, the defendant in a criminal child molestation case sought to cross-examine one of the victims and her mother about a specific incident of alleged lying "related to why [she] was unable to continue helping on her friend's paper route." 98 Wn. App. 817, 822, 991 P.2d 657 (2000), *abrogated on other grounds by State v. DeVincentis*, 150 Wn.2d 11, 74 P.3d 119 (2003). The victim's mother had stated under oath that the victim quit the route out of fear of the defendant, but the victim stated in an interview that she lost the job because she sometimes threw papers away instead of delivering them. *Griswold*, 98 Wn. App. at 822-23. The defendant wished to impeach the State's witnesses to show their dishonesty, but the trial court did not allow cross-examination on this issue. *Griswold*, 98 Wn. App. at 823, 830.

The trial court did not abuse its discretion because, even "assuming the prior false statement [was] relevant to [the victim's] credibility, her prior false statement [was] not germane to the guilt issues." *Griswold*, 98 Wn. App. at 831. The issue was "clearly collateral" and would have led to a "mini trial" relating to the victim's paper route. *Griswold*, 98 Wn. App. at 831.

In *O'Connor*, the State charged the defendant with malicious mischief in the second degree for slashing the tires on his ex-girlfriend's car. 155 Wn.2d at 337. The victim received compensation from both the defendant, and her insurance company, leading to a windfall of about $300. *O'Connor*, 155 Wn.2d at 339-40. The defendant sought to cross-examine the victim about her payment from the insurance company, arguing her windfall went to her credibility and "ability to tell the truth on the stand," but the trial court ruled that facts about the payment were relevant only to her character, not to whether her testimony was likely truthful. *O'Connor*, 155 Wn.2d at 339-40.

The court observed that "the *York*, *Wilson*, *Griswold* line of cases contemplates consideration of whether the evidence sought to be explored during cross-examination under ER 608(b) is *relevant* to the issue at hand." *O'Connor*, 155 Wn.2d at 350. It noted that "[p]rohibiting the trial court from considering the issue of germaneness to the issue at hand when exercising its discretion under ER 608 could result in a system under which a trial court is constitutionally *required* to admit *any* instance of a key witness's prior misconduct," which would be "clearly contrary to ER 608." *O'Connor*, 155 Wn.2d at 350. The court held,

> [I]n exercising its discretion under ER 608, a trial court may consider whether the proposed subject of cross-examination is relevant to the witness's veracity on the stand and germane to the issues in question at trial. While the retention of the $300 may reflect an instance of dishonesty, it did not involve a lie under oath. . . . Moreover, the retention of the excess $300 was not germane to the key factual issue to which [the victim] testified, namely the fact that [the defendant] was outside her house on the night her tires were slashed. Fundamentally, it is reasonable to conclude that the insurance payment is not relevant to the ultimate question of whether [the defendant] slashed the tires. Therefore, the trial court acted within its discretion when it determined that the retention of the excess $300 was not probative of [the victim's] truthfulness on the stand because it was simply too attenuated from her testimony regarding the events on the night in question.

*O'Connor*, 155 Wn.2d at 352-53.

In this case, Braun denied allegations of misconduct during his employment at a clinic in his discovery responses. He stated this case was the only "allegation, claim, complaint, or lawsuit" alleging any inappropriate conduct or improper and/or negligent or substandard treatment that he had ever been subjected to. CP at 716. As a result of a subpoena to the clinic, the Estate learned of three sexual misconduct grievances filed against Braun that led to his suspension and ultimately his withdrawal.

21

The trial court granted Braun's motion to exclude his past misconduct from evidence and prohibit the Estate from cross-examining him with his false and misleading discovery responses at trial. We review whether this decision was an abuse of discretion by looking to whether the misleading discovery responses were germane to the issues in this case or collateral such that they would likely result in a mini-trial.

This case is most similar to *Griswold*. The defendant in *Griswold* alleged that the victim and her mother had made inconsistent statements at a previous hearing and during an interview and wished to cross-examine them on these statements. 98 Wn. App. at 822-23. As in this case, the alleged misstatements were made during the course of the litigation. Also as in this case, the misstatements had to do with matters collateral and unrelated to the litigation. Braun's sexual misconduct at a clinic in 2005 is no more relevant to his treatment years later of Harbottle than the *Griswold* victim's loss of her paper route were to the state's prosecution of Griswold for child molestation. In both cases, the only relevance of the misconduct would have been to impeach credibility as a witness on a collateral matter.

Unlike *York* and *Griswold*, this case is civil and does not implicate a criminal defendant's fundamental rights or merit "extra latitude" in cross-examination of essential prosecution witnesses. 28 Wn. App. at 36. By comparison, *Loeffelholz,* a civil case, noted the trial court's "broad discretion" to admit or exclude alleged misconduct. 119 Wn. App. at 708.

The trial court had access to the full record and was in the best position to make a decision as to whether to allow cross-examination on this issue. Additionally, Braun's history of sexual misconduct was collateral to the issues in the case. The trial court did not abuse its discretion by excluding evidence of Braun's misleading discovery responses.

We affirm.

                                                            Melnick, P.J.

We concur:

Sutton, J.

Glasgow, J.